Donald A. Ecklund
Kevin G. Cooper
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700 phone
DEcklund@carellabyrne.com
KCooper@carellabyrne.com

*Local Counsel for Plaintiff*

[Additional Counsel on Last Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID D'AGOSTINO, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>INNODATA INC., JACK ABUHOFF, MARK SPELKER, and MARISSA ESPINELI,<br><br>        Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff David D'Agostino ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Innodata Inc. ("Innodata" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff

believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Innodata common stock during the period from May 9, 2019 through February 14, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2.      Innodata is a global data engineering company that purports to be "delivering the promise of AI to many of the world's most prestigious companies." The Company states that it provides AI-enabled software platforms and managed services for AI data collection/annotation, AI digital transformation, and industry-specific business processes.

3.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts, including that Innodata: (1) did not have a viable AI technology; (2) its Goldengate AI platform is a rudimentary software developed by just a handful of employees; (3) it was not going to utilize AI to any significant degree for new Silicon Valley contracts; (4) it was not effectively investing in research and development for AI; and (5) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Innodata's AI business and development and related financial results, growth, and prospects.

4.      On February 15, 2024, Wolfpack Research published a report (the "Wolfpack Report") revealing that Innodata misrepresented the nature and extent of its business and operations. The Wolfpack Report showed that Innodata's AI is really "smoke and mirrors" and that the Company's marketing claims are like "putting lipstick on a pig." While Defendants touted

Innodata's status as an AI pioneer, other companies were only hiring Innodata for cheap labor and its operations were powered by thousands of low-wage offshore workers, not proprietary AI technology. The Company also stopped disclosing its Research and Development (R&D) spend after the first quarter of 2021. The Wolfpack Report highlighted that Innodata's total investment in R&D over the past five years was only $4.4 million, with even less allocated to R&D in 2023 than what was spent on promoting its "AI" technology through press releases.

5.      On this news, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

8.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

10.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

11.     Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Innodata common stock during the Class Period and has been damaged thereby.

12.     Defendant Innodata Inc. is a data engineering company headquartered in Ridgefield Park, New Jersey. The Company's stock trades on the Nasdaq under the ticker symbol "INOD."

13.     Defendant Jack Abuhoff ("Abuhoff") has served as President and Chief Executive Officer ("CEO") of Innodata at all relevant times.

14.     Defendant Mark Spelker ("Spelker") served as the Chief Financial Officer ("CFO") and Executive Vice President of Innodata from October 2020 to March 2022.

15.     Defendant Marissa Espineli ("Espineli") has served as the Interim CFO of Innodata since March 2022.

16.     Collectively, Defendants Abuhoff, Spelker, and Espineli are referred to throughout this complaint as the "Individual Defendants."

17.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these

false statements or to cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

18.     Innodata and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

19.     Innodata is a data engineering company that operates through three segments: Digital Data Solutions ("DDS"), Synodex, and Agility. The DDS segment purportedly engages in the provision of AI data preparation services as well as a range of data engineering support services, the Synodex segment offers an industry platform to transform medical records into digital data, and the Agility segment provides an industry platform for marketing communications and public relations professionals to monitor and analyze news channels and target and distribute content.

20.     Over the last few decades, Innodata's business has been slowly decaying as automatic data annotation has made the Company's historical business of offshoring manual data annotation less profitable. In 2019, Innodata supposedly began implementing AI and machine learning and began marketing itself as an AI company.

21.     Throughout the Class Period, Innodata advertised its new AI-centered operations to investors and currently presents its market opportunities as AI data preparation, AI model deployment and integration, and AI-enabled industry platforms. Defendants repeatedly made positive statements about the Company's AI expertise and capabilities, which supposedly resulted in a growing number of Silicon Valley contracts. While advertising the transformational

4

capabilities of the Company's AI, the Company contradicted its own statements by steadily reducing its R&D spending over the last five years before declining to disclose the amount beginning in 2021.

22.     On February 15, 2024, the Wolfpack Report revealed that Innodata misrepresented the nature of its offshore operations in relation to its progress in AI. Investors were unaware that humans, not AI, were performing the brunt of Innodata's work, which was highly labor-intensive with cheap, offshore workers conducting data entry. Innodata's reliance on offshore labor comes from DDS and Synodex, a data digitization practice focused on digitizing medical records and insurance data. The center of Innodata's business is its brigade of offshore employees, not proprietary AI. Despite supposedly implementing AI in 2019, Innodata's full-time offshore employee count has since increased by approximately 15%. The Company also does not employ a Chief Technology Officer, further demonstrating its lack of commitment to AI expertise.

23.     The Wolfpack Report also revealed that Goldengate, the centerpiece of Innodata's reported AI technology, was not as large of an investment as the Company represented. Records from Innodata Labs, which was supposedly the source of its AI development, indicate that the team only consisted of eight employees when the product was developed, and that at least four of those employees have since left the Company. Moreover, customer reviews of the product were unfavorable and did not convert to sales.

24.     Innodata has been able to pose as an AI company as a result of contracts with true AI companies to use its DDS segment to outsource the labor intensive, often one-time job of structuring and targeting previously unstructured data to be used to train Large Language Models ("LLMs"). Innodata and Defendant Abuhoff referred to these contracts as "transformational" but concealed their true nature and viability. The Wolfpack Report alleges that Innodata management

tried to conceal declining revenue in DDS through low-quality acquisitions for a total of $9.6 million and that these acquisitions were combined to create the unprofitable Agility segment.

25.     Despite representing to investors that Innodata "develops custom AI models" that it deploys and integrates for a diverse range of industry customers, Innodata did not have a viable AI and was not effectively developing the technology. As a result of Defendants' misleading statements and omissions about Innodata's AI business and development, investors were unaware that Innodata was not effectively operating as an AI company and that Defendants were misrepresenting its "AI expertise."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

26.     The Class Period starts on May 9, 2019, when Innodata held an earnings call about its reported financial results for its fiscal 2019 first quarter. On the call, Defendant Abuhoff represented to investors that Innodata's internal AI development was ready to be deployed externally and that it was the key to repositioning Innodata's core business, stating:

> Our plan for the year is to try to hold revenue at roughly the same level as last year in DDS, while at the same time doing the necessary heavy lifting to reposition the core business for growth next year. ***The key enabler to our repositioning will be certain AI technologies that we developed and validated internally for the past 2 years.*** These technologies contributed to our turnaround last year, in which we increased our adjusted EBITDA at the end of 2018 to the highest that it has been as a percentage of revenue since 2014.
>
> ***That having been accomplished, we now believe we can turn our AI focus externally, building these tested technologies into market-facing services and product offerings, designed around helping enterprises integrate AI into events, document and content transformation, which in turn are expected to increase revenues and drive growth for us.*** To accomplish this, we've brought on senior-level product management marketing talent, who will be working closely with our AI engineering team. We're enthusiastic about the work that's going on now. By the end of this year, you'll see clearly the repositioning that will have resulted from their work.

27.     Defendant Abuhoff further stated: "At the same time, in 2019, we're working on exciting strategy to turn our AI development into market facing product to fundamentally reposition the core business for sustained growth." In response to an analyst's question about the fundamental advantage of their new AI with customers, Defendant Abuhoff stated:

> ***What we're able to do with our AI is we are able to make that process much less people intensive***. And to make those documents readable by computers, and that's the key thing. I mean that's really about what we've been doing in our Synodex business, our docGenix business. It's what we've been doing in our core business to produce publishable product for large information providers. So what we're doing now is we are saying okay.
>
> Where are there problems out there in the world in enterprises, where people are still contending with the fact that there is effectively non-digital data. ***There's data that computers can't read real well, and we've trained AI models to be able to dramatically reduce the human intervention required to make those machine readable. And we have the capabilities now and we're learning to know how to mix AI with human expertise to achieve a very efficient and very high-quality result***. So we brought on the product manager, who was product manager at IBM Watson. He's very intrigued by what we are doing. He thinks there's a lot of applicability in the market. We've brought on a marketing lead from another high-profile company, and they're working on productizing those things.

28.     During an earnings call on August 8, 2019, Defendant Abuhoff stated: "In our DDS business, we used our expertise in machine learning and AI to drive significant costs out of that business, and that process is still ongoing." In response to an analyst's question about the scope of Innodata's AI business, Defendant Abuhoff further stated:

> ***So the AI that – we're using AI in all of our businesses***. That's going to be part of our strategy. ***But for the most of the AI investments that we've made has actually been in our core business, and we used that investment early on in order to drive operational excellence and help us with our cost rationalization and turnaround of that business last year. Now what we're doing is we're building that into market-facing products that will help us expand our addressable market***. I think one of the limiting factors that we've had has been the size of our addressable market. And given what's going on in the world today, how businesses are integrating AI, is an essential core strategy. But they need accurate comprehensive data in order to drive the intelligent predictions that they're looking for as outcomes. There's an opportunity for us to significantly break out of that rather small addressable market. On top of that, the types of technologies and the things that we're developing also have applicability in our core market. So we very much

value the customers that we've got and the kind of customer base that we've got, and we're going to be able to address their needs as well as break out and expand those addressable markets.

29.     In response to an analyst's follow-up question about whether Innodata has "gotten

any new business in AI specifically[,]" Defendant Abuhoff stated: "Yes, we have."

30.     During an earnings call on November 7, 2019, Defendant Abuhoff stated:

*And over the past couple of years, we've been harnessing AI and machine learning capabilities*. The AI/ML revolution that is transforming every company in every industry is still in his first or second inning, and exponential and accelerating growth is expected. Our history of expertise in managing, curating and securely processing large amounts of data and harnessing AI has positioned us ideally to take advantage of this secular trend.

*For the last 2 years, we've been on a path of transforming our business in order to become a leader in these fast-growing markets. This journey began with us creating AI-based solutions for our own internal use, and our success here enabled us to remove several million dollars of costs of manual human labor, management and infrastructure, while at the same time, improving the quality of our offerings.*

*Our success with developing these AI capabilities has now enabled us to package them as solutions that we can take to a wider range of industries and applications.* And we are seeing an excellent response from the marketplace. *By way of example, we are on track to close this year over $1 million of opportunities for the new services listed on our website with companies that are outside our traditional publishing sector.*

In 2008, we brought in only 9 new clients from outside our traditional publishing sector. But in just the last 2 months alone, we have put in place pilots and pipeline with a multiple of that. We're either in pilot or discussing pilots with financial services companies, healthcare companies, media conglomerates and others as well. Our marketing team, which we expanded significantly this year in order to power our transformation, is really hitting its stride. Year-to-date, we've driven close to 10,000 warm leads with a variety of marketing programs across our segments.

31.     In response to an analyst's question about Innodata's skill set and expertise

regarding AI, Defendant Abuhoff further stated:

If you take a look at our new website, what you'll see is we do several things with artificial intelligence, starting with helping people build their AI models. *So there are people who are building AI models, they need to train those models. And what*

*they need is a combination of AI, human expertise and a secure data infrastructure in which to do that. We bring all that to the table.*

In addition to that and on top of that, we're looking at data transformation and data curation. *And when we're performing data transformation, data curation for people, we're using the AI models that we've built, oftentimes working with the frameworks that are produced by some of the very large companies. But they are models that we've built and that we've engineered, we maintain and we manage, that turn documents that people now read into data that computers can read.*

*We're helping to curate data, master data that's at the core of companies' success, like CRM data, that again works with the combination of our trained experts and our robust trained AI models.*

32.     In a conference call on March 12, 2020, in response to an analyst's question about expanding in AI, Defendant Abuhoff stated:

*We're working with the leading information providers, applying AI to continent operations on their behalf. And we're receiving very good market recognition in those markets for having done that.* There's a lot of excitement about what we're doing. But I do think the real story here is that we've -- through that effort, we've -- and most notably, the investments we've made over the past 3 years in AI being applied to those kinds of challenges, we're now very well positioned to pivot to these larger markets, or to, I should say, embrace these larger markets.

33.     In a conference call on May 14, 2020, Defendant Abuhoff stated: "Last year, as you recall, *we pivoted the company from a publishing services provider to a data engineering company, rolling out new products and solutions to help companies in wider markets, prepare data for AI and put AI to work in their businesses.*" Defendant Abuhoff further advertised that "*[w]ith our AI, focus, our pipeline soon grew* to include banks, hedge funds, online trading platforms and financial services firms as well as drug companies, drone companies, software companies and even movie studios."

34.     In a conference call on August 6, 2020, Defendant Abuhoff stated:

AI data preparation includes collecting, cleaning and normalizing data as well as annotating classifying and segmenting data. And these are precisely the things that we believe we're the best in the world of providing. But we've traditionally provided them for a small market. Now a new, much larger market is emerging. Given our history of being the leading provider of high-quality data to leading legal

financial and medical information companies, we see a clear task to becoming a leading provider of AI data preparation and annotation to companies that are seeking to build models in these and other areas.

*We only started marketing and selling AI data prep and annotation services in Q4 of last year. Nevertheless, to date, we have closed 15 new customers. We have another 16 customers in late-stage pipeline that are expected to close in the second half. We are forecasting a total of $3.5 billion in bookings -- excuse me, $3.5 million of bookings from this market this year, and we're expecting that a majority of these deals will produce recurring managed services revenue at our target margins.* We have also identified opportunities to license our data annotation platform, which is a customer-facing version of our internal production platform that we have refined over many years.

*It is worth mentioning that one of our recent data annotation wins is with a prominent big tech company. To secure this work, we beat out 7 incumbents, winning the business based on our quality and our capabilities.* Our current pipeline includes banks, hedge funds, online trading platforms, financial research firms as well as drug companies, drone companies, AI software companies and 2 big tech companies.

35.     During an earnings call on November 12, 2020, Defendant Abuhoff affirmed

Innodata's progress in AI, stating:

Let me give you some color on what we are seeing and executing on the ground. In our core digital solutions business, *we are now primarily focused on the AI data preparation market that was estimated $1.9 billion this year and is expected to grow to $3.2 billion by 2023.* We believe that this is a made-to-order market for us in which customers prize data quality above anything else, which means we're able to bring to the task our 25 years of finely honed skills and technology that we developed to create near-perfect data for leading information companies.

*As a result, we're winning deals in the AI data preparation market against several incumbent providers. We launched our AI data preparation offering late in Q4 last year. And to date, we have closed 18 new customers, and we have another 20-or-so in our late-stage pipeline.* By the time the year is done, we expect our DDS segment to have signed approximately 40% more new business than it did last year.

As an example of our execution in this segment, one of the world's largest social media companies became our client in Q2 when we beat out 17 other companies in a highly competitive 5-month long RFP. *In just 5 months, we've become one of this company's preferred vendors, and we're now running multiple projects across 7 languages. Our scope includes AI-based search classification to improve the search experience, sentiment analysis to automate content filtering, product classification engines to improve product placement for advertising, trend*

*representation to identify trending topics on the platform, toxicity identification algorithms to identify content that violates terms of service and misinformation identification to auto identify fake and misleading information.*

36.    During an earnings conference call on March 11, 2021, Defendant Abuhoff

advertised the new Goldengate platform to investors, stating:

Second, we have been building a proprietary AI platform we call Golden Gate. In a nutshell, Golden Gate "reads documents and text and tells you what the documents are about." Golden Gate accepts any kind of documents, images, PDFs or web copy, it doesn't matter. ***And it performs a series of cognitive tasks to extract intelligence that people can use for generating inferences and powering analytical applications.***

***In terms of AI, it is truly state of the art, serving up no-code AI with transfer learn built on generative language models we have developed and perfected over the past 5 years of deploying industrial deep neural networks. Golden Gate will be the AI under the hood that powers our data annotation platform and brings AI capabilities to our industry platforms like Synodex and Agility.***

***Golden Gate will also be the foundational technology for work we perform for customers. The main benefits of the platform is that it's no code, so it doesn't require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Golden Gate in combination with our SMEs, we were able to build high-performing cutting-edge models that address real-world problems.***

37.    On the same call, in response to an analyst's question about how Innodata uses AI,

Defendant Abuhoff further advertised Goldengate, stating:

***So we've built Golden Gate, which is cutting-edge AI.*** We're combining that with our subject matter experts, people that we might have, in earlier days, used to do things like ebook search. ***But now we're combining those people with the Golden Gate technology to create cutting edge, high-performing AI models and very high-quality data that can be used to train those models.*** And we're doing that in 3 layers. We're doing that for people who need high-quality data to train their own models. We're doing that for people who don't have the data sciences' team but want AI solutions to help them run their businesses better. And then we're also taking that AI and we're building that into industrial platforms like Synodex and Agility will soon be that are powered by AI.

So it's very much tethered in our legacy, in our history of having subject matter experts accessible to us around the world. And it's very much tethered in our culture of data quality -- of being fanatical about data quality of having the processes and technology to create that high-quality data. ***And now instead of delivering back to***

> *the market ebooks, we're delivering to them high-quality training data. We're delivering to them AI solutions, things programmed with data. And we're delivering AI industry platforms that generalize the AI into platforms that do things for people that they require to be done in order to run their businesses better.*

38.    On March 12, 2021, Innodata filed its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). In the 2020 10-K, Defendants Innodata, Abuhoff, and Spelker stated:

> *Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.* Goldengate accepts a wide range of documents – including images, PDFs, and web copy – and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. *It serves up no-code AI with transfer learning built on generative language models we have developed over the past five years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.*

39.    In a conference call on May 6, 2021, Defendant Abuhoff stated: "we're also seeing an increase in deal sizes generally. For example, our pipeline includes a large global technology company that spends tens of millions of dollars on AI initiatives annually." In response to an analyst's question about Innodata's skill set for creating AI, Defendant Abuhoff stated in pertinent part:

> So I think as you know, we started building and working with AI about 5 years ago. We did a lot of work internally with it, and *we built some high-performing systems that are working very, very well for us. We turn those systems into external market-facing capabilities, and we started to bring those to market last year, and we're continuing that this year. And we're finding that our combination of very high-performing AI stack that has been trained through lots of content development work that we've done, in combination with our global reach in terms of subject matter expertise and humans in the loop that can work with our technology to create high-performing training data for our customers and create very compelling outcomes in terms of applied AI, is really the perfect combination to be competing in the world.*

40.    During an earnings conference call on August 5, 2021, Defendant Abuhoff again touted the Innodata's progress in AI, stating:

The AI initiatives we're working on fall basically into 2 categories. ***First category are AI implementations that help organizations modernize or streamline processes. The second category are AI implementations that deliver fundamentally new experiences.*** We're now working on AI implementations with 2 of the largest Silicon Valley tech companies, and we have discussions taking place with 3 others.

We're working with about 14 large enterprises and have late-stage pipeline discussions in the works with another 12 or so. And we're working with 15 early stage companies, and we've got about 20 others that are proceeding at pace. We believe that over the next several years, AI implementations, which up until now have largely been the domain of Big Tech Silicon Valley will increase significantly among early adopter and early majority organizations following the classic technology adoption curve, and hastened by the dramatic improvements in broadband networks and mobile device chipsets as well as the maturity of AI/ML development tools and the increasing trend for organizations to invest in data science. As this occurs, AI will start to become embedded in everything that we do and everything that we use. We believe that the net result of this will be an increasing demand for domain-specific high-quality training data and models.

41.     In response to an analyst's question about the "flywheel characterization synonymous with AI technology" in an earnings call on November 4, 2021, Defendant Abuhoff stated in pertinent part:

So what's very exciting to us is a couple of things. ***First, we've created an AI platform that we've trained with a lot of data.*** We're a data company. We've got a lot of data. ***So we've trained our algorithms to perform very, very well. We're building those algorithms. We're embedding them into many of our platforms, all of our new platforms for sure.***

***We're deploying those as accelerators for many of our existing clients, enabling to get better results and more accurate results.*** And just like you say, as we keep going down that journey, our performance only gets better. And as it gets better, our customers like us more. As they like us more, they give us new work to do. As the algorithms perform better and more use cases become presentable and become actionable, then that creates more market opportunity.

42.     In an earnings call on March 17, 2022, Defendant Abuhoff stated:

Here's a recent very important win. ***One of the largest Fortune 50 semiconductor manufacturers selected us to build fully-trained deep-learning AI models for automated retail and manufacturing solutions. This is an example of end-to-end AI services from synthetic data creation to model training and model management.***

* * *

In addition, ***our plan calls for us to develop additional SaaS platform products that encapsulate our proprietary AI*** in order to reimagine legacy, slow and inefficient knowledge-based processes. Of course, we are laser-focused on execution to ensure that we capitalize on the opportunities in our industry and position the company to be ahead of the curve in terms of our customer needs.

43.     In response to an analyst's question about Innodata's value, Defendant Abuhoff stated: "[t]he other thing that we've got going for us that is distinguishing us in the competitive landscape is our ***full-service AI capabilities***. So we're able to demonstrate to them technologies that make the process of creating high-quality data more effective and efficient. ***We're able to show them our platforms***." Defendant Abuhoff further advertised: "***The cool thing is we're able to start them out with high performance because of the way we built our AI technologies***. There's a lot of transferred learning, it's called. They work quickly immediately on new tasks. But then as they become trained on those specific customer-specific tasks, they contribute more and more value as that goes forward."

44.     On March 24, 2022, Innodata filed its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). In the 2021 10-K, Defendants Innodata, Abuhoff, and Espineli stated: "***Our platforms and services are powered by Goldengate, our proprietary AI/ML platform, as well as other technologies we have developed***." They further stated:

> ***Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.*** Goldengate accepts a wide range of documents – including images, PDFs, and web copy – and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. ***It serves up no-code AI with transfer learning built on generative language models we have developed over the past six years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.*** One of the main benefits of the platform is that it's "no-code", so it doesn't require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Goldengate in combination with our SMEs, we are able to build high-performing, cutting-edge models that address

real-world problems. ***In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we intend to commercialize it further as both a customer-facing technology and as the engine under other potential industry solutions.***

45.     During an earnings call on May 12, 2022, Defendant Abuhoff stated:

On the product front, we also made great progress in just the last 8 weeks*. **We launched our AI-enabled document intelligence platform in late March as planned. This new customer-facing platform uses our proprietary Goldengate AI technology to automatically extract meaning from complex documents.** It can be utilized across domains, from health care to financial services to media and entertainment, essentially any business that employs people to read or manage complex documents. Initial feedback from our customers has been positive, and we are in the late stages with 2 opportunities, which taken together, we believe will be worth approximately $1 million per year in likely recurring revenue.

46.     In an earnings call on August 11, 2022, Defendant Abuhoff stated: "We also have made investments in commercializing our ***proprietary Goldengate AI technology stack in the form of an AI data annotation platform, an AI document intelligence platform and industry solutions that utilize our AI to enable customers to do deeper analytics and textual data and documents with fewer people***." Defendant Abuhoff further stated: "We launched our AI-enabled document intelligence platform in late March as planned. ***This new customer-facing platform uses our Goldengate AI technology to automatically extract meaning from complex documents. It can be utilized across domains, from health care to financial services to media and entertainment, essentially any business that employs people to read or manage complex documents.***"

47.     On February 23, 2023, Innodata filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). In the 2022 10-K, Defendants Innodata, Abuhoff, and Espineli stated: "We develop custom AI models (where we select the appropriate algorithms, tune hyperparameters, train and validate the models, and update the models as required)" and "***in addition to deploying and integrating AI models***, we often provide a range of data engineering

support services including data transformation, data curation, data hygiene, data consolidation, data extraction, data compliance, and master data management." They further stated:

> ***Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.*** Goldengate ingests unstructured data and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. ***It serves up low-code AI with transfer learning, orchestrating generative LLMs we have developed over the past seven years of deploying industrial deep neural networks as well as third-party foundation models.*** It integrates both with our internal systems and customer environments through application programming interfaces ("APIs").
>
> ***Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.*** One of the main benefits of the platform is that it is "low-code", so it does not require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Goldengate in combination with our SMEs, we are able to build high-performing, cutting-edge models that address real-world problems. ***In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we commercialized it further as both a customer-facing technology and as the engine under other potential industry solutions.***

48.     In an earnings call on February 23, 2023, Defendant Abuhoff stated:

Early in the first quarter of 2023, a large financial technology company expanded scope with us to leverage our proprietary AI models more fully and reengineer their technology for the cloud to drive operational efficiencies. ***Our proprietary AI engine, Goldengate, uses the same underlying encoder-decoder transformer neural network architecture as GPT.*** While GPT is trained broadly, Goldengate is trained narrowly on specific tasks and domains. We have experimented with coupling GPT and Goldengate, and this seems to result in even higher orders of performance. This is the third scope expansion we've had with this company over the course of the past 6 months, again, providing further validation of our land-and-expand strategy.

> ***We believe our third opportunity is to harness GPT and other large language models in our own AI industry platforms. Just last month, we announced PR CoPilot, a new module within our Agility PR platform that combines proprietary Innodata technology and GPT to enable communications professionals to generate first draft of press releases and media outreach in record time.***

With our release of PR CoPilot, we became, we believe, the PR industry's first integrated platform to incorporate large language model technology. The implementation was significant for Innodata, and we received a supportive write-up in PR weekly for it. The start-up named Jasper vaulted to unicorn status when it

implemented something very similar to PR CoPilot for creating blogs and social media postings. Their efforts got them a $125 million Series A round on a healthy $1.5 billion valuation.

With respect to our Agility platform, we're seeing positive momentum in key performance indicators, which we think PR CoPilot and our newly integrated social media listening product will help to further accelerate. In Q4, Agility platform sales grew 6% over Q3, which annualizes to a roughly 26% growth rate.

49.     During a conference call on May 11, 2023, Defendant Abuhoff stated: "over the past several years, ***we have been integrating both generative and classical AI into real-world customer operations, workflows and platforms***." In response to an analyst's question about Synodex and Agility, Defendant Abuhoff further touted PR CoPilot, stating: "***We built the PR CoPilot, the generative AI model that we launched within the platform in January.*** It was the first mover within that industry. ***We've got great strong customer reception, a super cool road map for successive releases around that this year***."

50.     During an earnings call on August 10, 2023, Defendant Abuhoff told an analyst that "work that we've done in the past" included "***creating high-quality data and building AI models*** and building and integrating them in the wild" and "[w]e're continuing to build still additional real-world experience in terms of ***integrating classical and generative AI into operations and products.*** And all of these are proving to create significant competitive advantage for us in the market."

51.     In an earnings call on November 2, 2023, Defendant Abuhoff stated:

Looked at year-over-year, we see the same thing. We returned $4.4 million of adjusted EBITDA growth on $3.7 million of revenue growth. ***Third quarter growth was driven by the start of ramp-up for generative AI development work with one of the new big tech customers we announced this summer.*** We expect our work with this customer to continue ramping up in the fourth quarter and into the first quarter, potentially reaching a $23 million to $25 million run rate at the end of the year with which to start next year. ***At the very end of the quarter, we also kicked off our generative AI development program with the other new big tech customer we announced this summer, and we expect it will also contribute to fourth quarter***

17

*revenue.* In fact, we anticipate continuing to expand revenue with both of these new customers through Q4 and in 2024.

* * *

*In the third quarter, we closed 3 important enterprise generative AI opportunities with large companies. Their scope ranges from strategy to implementation.* In one of the engagements, we will be helping a leading information company create a strategic roadmap for AI LLM integration for its products and internal operations, and we will be building LLM proofs of concept. In another, we will be helping fine-tune LLMs for 3 customer use cases pertaining to legal services. And the third, we will be creating data sets to train an LLM to support doctor patient interactions.

52.     The statements referenced above in ¶¶26-51 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to Innodata's AI business, which were known to Defendants or recklessly disregarded by them as follows:

   a)     Innodata did not have a viable AI technology;

   b)     Innodata's Goldengate AI platform is a rudimentary software developed by just a handful of employees;

   c)     Innodata was not going to utilize AI to any significant degree for new Silicon Valley contracts;

   d)     Innodata was not effectively investing in research and development for AI; and

   e)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Innodata's business, operations, and prospects related to its purported AI technology.

53.     On February 15, 2024, the Wolfpack Report revealed that Innodata misrepresented the nature and extent of its business and operations as an AI. Wolfpack highlighted that Innodata's total investment in R&D over the past five years was only $4.4 million, before it stopped disclosing

that figure entirely in 2021, with even less allocated to R&D in 2023 than what was spent on promoting its "AI" technology through press releases.

54.     On this news, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Innodata's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Innodata, their control over, and/or receipt or modification of, Innodata's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Innodata, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved the centerpiece of Innodata's reported business, its AI technology and development.

56.     Innodata's executives, officers, and directors have also sold approximately $16 million in stock since 2020, with $13 million of those sales occurring in the past nine months. Many of these sales occurred soon after promotional press releases touting the Company's AI. For example, on August 29, 2023, following an announcement that Innodata potentially expected to add $10 million in annualized revenue following a partnership expansion, Defendant Abuhoff and Nick Toor, the Chairman of the Board, sold approximately $3.2 million in stock that same day.

Certain of Innodata's officers and directors also dumped their stock after favorable press releases on May 11, 2023, June 13, 2023, and July 18, 2023. Defendant Espineli sold approximately $400,000 in stock on those occasions.

57.     As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

58.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

59.     On February 15, 2024, the Wolfpack Report revealed that Innodata misrepresented the nature and extent of its business and operations, placing an overemphasis on being an AI pioneer. In reality, the AI was "smoke and mirrors" and Innodata even stopped disclosing its R&D spend after the first quarter of 2021, after its total investment in R&D over the past five years had declined to only $4.4 million. On this news, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

60.     The decline in Innodata's stock price is directly attributable to the announcements in the Wolfpack Research report regarding the Company's AI.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

61.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b)  The omissions and misrepresentations were material;

c) The Company's common stock traded in efficient markets;

d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

62.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

63.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

64.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Innodata common stock between May 9, 2019 through February 14, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

67.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a)  Whether Defendants violated the Exchange Act;

    b)  Whether Defendants omitted and/or misrepresented material facts;

    c)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e)  Whether the price of the Company's stock was artificially inflated; and

    f)  The extent of damage sustained by Class members and the appropriate measure of damages.

68.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

69.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

71.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if

they had been aware that the market prices had been artificially and falsely inflated by Defendants'

misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against All Defendants)

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

76.     Defendants acted as controlling persons of the Company within the meaning of

§20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the

Company, the Individual Defendants had the power and authority to cause or prevent the Company

from engaging in the wrongful conduct complained of herein. The Individual Defendants were

provided with or had unlimited access to the documents where false or misleading statements were

made and other statements alleged by Plaintiff to be false or misleading both prior to and

immediately after their publication, and had the ability to prevent the issuance of those materials

or to cause them to be corrected so as not to be misleading. The Company controlled the Individual

Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to

§20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action pursuant to Rule 23(a)

and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and

a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil

Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory and punitive damages in favor of Plaintiff and the

other class members against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

        C.      Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

        D.      Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

        Plaintiff hereby demands a trial by jury.

DATED:  February 21, 2024        Respectfully submitted,

*/s/ Donald A. Ecklund*
Donald A. Ecklund
Kevin G. Cooper
**CARELLA BYRNE CECCHI BRODY & AGNELLO,  P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700 phone
DEcklund@carellabyrne.com
KCooper@carellabyrne.com

*Local Counsel for Plaintiff*

Jeffrey C. Block (*pro hac vice* forthcoming)
Jacob A. Walker (*pro hac vice* forthcoming)
Sarah E. Delaney (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com

*Counsel for Plaintiff*

25