James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Rd.
Roseland, NJ 07068
Tel. 973-994-1700
JCecchi@carellabyrne.com
DEcklund@carellabyrne.com
KCooper@carellabyrne.com

[Additional Counsel Below]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID D'AGOSTINO, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>INNODATA INC., JACK ABUHOFF, MARK SPELKER, and MARISSA ESPINELI,<br><br>　　　Defendants. | Case No. 2:24-cv-00971-JKS-JSA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Francis Grondin ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Lead Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Innodata Inc. ("Innodata" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information

about Defendants.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE AND SUMMARY OF THE ACTION

1.     This is a securities fraud class action on behalf of all those who purchased or otherwise acquired Innodata common stock during the period from May 9, 2019 through February 14, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2.     Innodata purports to be a global data engineering company that is "delivering the promise of AI to many of the world's most prestigious companies." The Company states that it provides AI-enabled software platforms and managed services for AI data collection/annotation, AI digital transformation, and industry-specific business processes.

3.     Before the Class Period, Innodata primarily operated as a services company using offshore labor for manual data annotation. Defendant Abuhoff has been CEO of the Company for over 20 years, and in that time, Innodata has rebranded itself on numerous occasions without changing its underlying business. In the early 2000s, Innodata initially marketed these manual annotation services to academic and cultural institutions, then pivoted to start promoting itself as a leader in eBook services. In recent years, Innodata's revenue has been declining in its largest business segment, DDS, which management tried to conceal through low-quality acquisitions, which were combined to create Innodata's unprofitable Agility segment.

4.     In March 2018, the Company attributed the decline in DDS revenue to "reduced volume from a key e-book client" and "lower volume from other clients." It became clear that Innodata would need to pivot again, but in response, Defendants went far beyond adjusting the

1

Company's marketing pitch to target a new type of client as it had done in the past. Instead, Defendants completely misrepresented the nature of Innodata's business to investors. Beginning in 2018, Innodata suddenly began marketing itself as an AI company and represented that it had implemented AI and machine learning into its business. These claims were false. Innodata did not have the resources or expertise to innovate and had not developed AI technology.

5.      In making these claims, Innodata engaged in misconduct known as "AI washing," which essentially refers to misrepresenting a company's artificial intelligence capabilities. The term stems from "ESG washing" and "greenwashing", which refer to the practice of misrepresenting a product or supply chain's environmental impacts or benefits to gain a competitive edge. With the rise in public interest and investment in AI, public companies now have the opportunity to engage in AI washing to capitalize on the new AI boom. Because businesses involved in AI tend to see high stock prices, investors currently view AI as a competitive advantage.

6.      AI washing can occur in a few different ways. Some companies claim to use AI when they are actually using less sophisticated computing, overstate the efficacy of their AI over existing techniques, or suggest that their AI solutions are fully operational when they are not. In 2019, a MMC Ventures study, in partnership with Barclays, found that a rising number of new tech firms have described themselves as "AI start-ups" but used virtually no AI at all. Rather than building a whole AI system, many firms are simply adding a chatbot interface on top of a non-AI product.

7.      Throughout the Class Period, Innodata engaged in AI washing and advertised its new supposedly AI-centered operations to investors, presenting its market opportunities as AI data preparation, AI model deployment and integration, and AI-enabled industry platforms. Defendants

2

repeatedly made positive statements about the Company's AI expertise and capabilities, which supposedly resulted in a growing number of Silicon Valley contracts.

8.      Innodata's investors were led to believe that a new initiative called "Innodata Labs" had developed a unique AI technology, when in fact, it did not have the necessary resources to develop AI and the Company had not increased spending on research and development. At the time, the team at Innodata Labs only consisted of eight employees, and at least four of those employees have since left the Company. Despite this, Defendants represented that Innodata had developed a "proprietary, state-of-the-art" AI platform called Goldengate, which supposedly was incorporated into its existing business platforms, including Synodex and Agility. In reality, however, companies that actually develop AI have contracted with Innodata's DDS segment to outsource the labor-intensive, often one-time job of structuring and tagging previously unstructured data so it can train their Large Language Models ("LLMs"), not Innodata's. In other words, Innodata provided brut labor to companies working in AI; it did no artificial intelligence itself.

9.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts, including that Innodata: (1) did not have a viable AI technology; (2) its Goldengate AI platform is a rudimentary software developed by just a handful of employees; (3) it was not going to use AI to any significant degree for new Silicon Valley contracts; (4) it was not effectively investing in research and development for AI; and (5) based on the above, Defendants lacked a reasonable basis for their positive statements about Innodata's AI business and development and related financial results, growth, and prospects.

10.     Defendants' statements about Innodata's AI capabilities were false and misleading because Innodata lacked any expertise in AI and had not implemented AI into any of its business

3

segments. As a result of Defendants' misleading statements and omissions about Innodata's AI business and development, investors were unaware that Innodata was not effectively operating as an AI company and that Defendants were misrepresenting its "AI expertise." Despite representing to investors that Innodata "develops custom AI models" that it deploys and integrates for a diverse range of industry customers, Innodata did not have a viable AI and was not effectively developing the technology.

11.    On February 15, 2024, Wolfpack Research published a report (the "Wolfpack Report") revealing that Innodata misrepresented the nature and extent of its business and operations. The Wolfpack Report showed that Innodata's AI is really "smoke and mirrors" and that the Company's marketing claims are like "putting lipstick on a pig." While Defendants touted Innodata's status as an AI pioneer, other companies were only hiring Innodata for cheap labor and its operations were powered by thousands of low-wage offshore workers, not proprietary AI technology. The Wolfpack Report highlighted that Innodata's total investment in R&D over the past five years was only $4.4 million, with even less allocated to R&D in 2023 than what was spent on promoting its "AI" technology through press releases.

12.    On this news, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

13.    After the Class Period, on March 25, 2024, Innodata received a letter from the SEC's Division of Enforcement and later received a subpoena from the SEC on September 23, 2024. Later, on August 7, 2024, Innodata was subpoenaed by a grand jury in a Department of Justice ("DOJ") investigation. Both investigations relate to the misconduct alleged here, and the

4

involvement of the DOJ suggests potentially criminal conduct that goes beyond the existing allegations of fraud against Innodata.

14. Despite receiving the DOJ subpoena the day before releasing its second-quarter earnings for 2024, Innodata declined to disclose either the SEC or DOJ investigation. Innodata waited more than seven months to disclose both investigations and eventually buried the information in the Company's Form 10-Q for the third quarter of 2024, filed with the SEC on November 7, 2024. This delay was a continuation of Defendants' pattern of concealing the truth from investors.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

17. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation that has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

19.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND WITNESSES

### A. Parties

20.     Lead Plaintiff Francis Grondin is an individual investor. As shown in the certification previously filed with the Court (ECF No. 4-6), Lead Plaintiff purchased shares of Innodata common stock at artificially inflated prices during the Class Period and suffered damages from the violations of the federal securities laws alleged herein.

21.     Defendant Innodata Inc. is a data engineering company headquartered in Ridgefield Park, New Jersey. The Company's stock trades on the Nasdaq under the ticker symbol "INOD."

22.     Defendant Jack Abuhoff ("Abuhoff") has served as President and Chief Executive Officer ("CEO") of Innodata at all relevant times.

23.     Defendant Mark Spelker ("Spelker") served as the Chief Financial Officer ("CFO") and Executive Vice President of Innodata from October 2020 to March 2022.

24.     Defendant Marissa Espineli ("Espineli") has served as the Interim CFO of Innodata since March 2022. In February 2024, Defendant Abuhoff stated that Innodata had no imminent plans to hire a permanent, full-time CFO.

25.     Collectively, Defendants Abuhoff, Spelker, and Espineli are referred to throughout this complaint as the "Individual Defendants."

26.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities

analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading before its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions with the Company and access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

27. Innodata and the Individual Defendants are referred to herein, collectively, as "Defendants."

**B. Former Employees**

28. FE 1 was a director of business development at Innodata from October 2019 to January 2020. FE 1 reported to the Chief Product and Marketing Officer at Innodata, who in turn reported directly to Defendant Abuhoff.

29. FE 2 was an account executive at Innodata's Digital Data Solutions business from May 2017 to September 2020. FE 2 first reported to the head of the DDS division and then to an India-based vice president of the DDS division, who reported directly to Defendant Abuhoff.

30. FE 3 was a senior mid-market business development representative at Innodata from October 2021 to October 2022. FE 3 sold Innodata's Agility PR Solutions communications platform and reported to a senior business development manager at Innodata.

SUBSTANTIVE ALLEGATIONS

**A. Background on "AI Washing"**

31. The term "AI washing" was first coined in 2019 by the AI Now Institute, a research institute based at New York University. The term refers to the practice of companies exaggerating

7

or misrepresenting the role of AI in their products or services. This can include using AI-related buzzwords, such as "machine learning" or "deep learning," to describe tools that do not actually use these techniques. In reality, these tools do not fulfill the functions of true AI tools, which include processing information like humans to perform critical tasks, such as understanding natural language, providing suggestions, making decisions, and generating content.

32.    In recent years, the capabilities of AI systems have drastically improved. Technology companies have invested billions of dollars in AI initiatives and spurred a race to capitalize on new opportunities for growth. For example, in January 2019, Microsoft invested $1 billion in cash and computing power into OpenAI, the creator of generative AI tools ChatGPT and Dall-E. Later, in January 2023, Microsoft invested an additional $10 billion into OpenAI. In February 2023, Microsoft previewed its new Bing search engine with ChatGPT integration, and Google announced its own rival tool called Bard, for conversational-AI-assisted searching. Meta has also announced its intention to become a leader in generative AI and previously attempted to launch its own chatbot to rival ChatGPT in November 2023.

33.    AI washing can have serious consequences, including misleading consumers and investors about the capabilities of a product or service. It can also make it more difficult for genuine AI research and development to receive funding and attention. One of the key drivers of AI washing is the hype surrounding AI and machine learning. Many companies want to appear innovative and cutting-edge, and right now, claiming to use AI is an easy way to capitalize on increased investor attention.

34.    In the technology industry, companies can easily use AI as a buzzword to make their products sound more innovative or rebrand existing products rather than actually developing new AI-powered solutions. A common tactic involves using buzzwords like "AI-powered" or

8

"machine learning-driven" to make products sound more sophisticated than they actually are. However, these terms often have little concrete meaning and can be applied to a wide range of technologies. For example, a company might claim that its product uses machine learning when it simply uses a pre-trained model or a simple algorithm.

35.    The public's limited understanding about the true capabilities of AI makes it easier for companies to exaggerate or misrepresent their use of the technology. This makes it difficult for investors to assess such claims and distinguish between genuine AI-powered products and services and those that are simply using buzzwords as a marketing gimmick. For example, Amazon came under scrutiny in 2024 for its "Just Walk Out" technology installed at many of its physical grocery store locations. It was supposedly an AI-powered system designed to enable customers to simply pick up their items and leave, with AI sensors working out what customers chose and automatically billed them. In April 2024, it was widely reported that rather than solely using AI, the technology needed about 1,000 workers in India to manually check almost three quarters of the transactions.

36.    Federal agencies have recognized a growing need to protect investors and the public against AI washing. During a March 6, 2024 panel discussion at the American Bar Association's White Collar Crime 2024 conference in San Francisco, Gurbir S. Grewal, director of the SEC's Division of Enforcement, emphasized that the SEC was observing AI washing, stating that they, "see advisors saying they are incorporating AI when making investment decisions for individuals when they aren't," and compared the new phenomenon to greenwashing, stating that the SEC has similarly seen, "a lot of issuers talk about their ESG practice and products, and those products didn't live up to what was stated." During the same panel, Ian McGinley, the Commodity Futures Trading Commission's director of its Division of Enforcement, stated, "You can see [AI washing]

9

also playing out with more sophisticate firms, where investors want to know what AI capability a firm has. Everyone will want to make sure [the disclosures] are entirely accurate."

37.    On March 18, 2024, SEC Chair Gary Gessler stated, in pertinent part, "here at the SEC, we want to make sure that these folks are telling the truth. In essence, they should say what they're doing, and do what they're saying…Public companies should make sure they have a reasonable basis for the claims they make and yes, the particular risks they face about their AI use, and investors should be told that basis." On the same date, the SEC announced that it settled charges against two investment advisers for making false and misleading statements about their purported use of AI. The firms agreed to settle the SEC's charges and pay $400,000 in total civil penalties.

38.     Later, in September 2024, Gary Gessler further stated that investment advisers, broker dealers, and public companies "should not mislead the public by saying they're using AI when they're not, nor say that they're using it in a particular way and not do so." He continued, "[s]uch AI washing, whether it's by companies raising money or by financial intermediaries like investment advisers and broker dealers, may violate the securities laws." The SEC has demonstrated that it will remain focused on how public companies are addressing AI developments in their public disclosures.

39.    The Federal Trade Commission likewise warned in a February 2023 blog post that it will be focusing attention on how companies advertise their AI-based products.  Specifically, the FTC noted that exaggerating what an AI product can do, promising an AI product does something better than a non-AI product, and baseless claims that a product is AI-enabled are statements that the regulator will be looking out for. It also stated that companies need to know about the reasonably foreseeable risks and impact of their AI products and that if it fails or yields

10

biased results, they can't just blame a third-party developer or disclaim responsibility because the technology is a "black box." Despite purporting to use AI-enabled platforms, Innodata did not make any such warnings specifically addressing the failure or unpredictability of AI technology during the Class Period.

**B. Innodata Began to Pose as an AI Company Without Changing its Underlying Business Model**

40.    Innodata was founded in 1988 under a different name with an entirely different business model. At that time, the Company was designed to provide digitized content and create quality assurance and audit procedures. Before rebranding itself as an AI company, Innodata represented its business as being focused on offshoring manual data annotation, which had been slowly decaying.

41.    Before the Class Period, in the Company's Form 10-K filed with the SEC on March 22, 2018 ("2017 10-K"), Innodata described itself as a "global digital services and solutions company" that "comprise[s] a team of 5,000 diverse people in eight countries who are dedicated to delivering services and solutions[.]" There is no mention of Innodata even beginning to pivot to AI at that time. Rather, the sole mention of the term AI in the entire 2017 10-K was simply to comment that digital content-related services in the industry, "increasingly involve using advanced technologies such as machine learning and artificial intelligence (AI) to extract meaningful data from unstructured data in cost efficient ways."

42.    For all of 2017 and early 2018, while Innodata recognized the growing role of AI in the industry, there was no indication it had any expertise in AI and in fact operated an entirely different business model based on "services and solutions" provided by its team of 5,000 employees.

11

43. Only a few months later, in the Company's Form 10-Q filed with the SEC on May 15, 2018, Innodata changed the definition of its business slightly, describing the Company as a "global services and technology company focused on data transformation, enrichment, and management" and suddenly introducing a new segment of the business focused on AI, stating, "Innodata Labs, our technology incubator, focuses on applied machine learning and emerging artificial intelligence." Innodata also changed the name of two of its three operating segments – Innodata Advanced Data Solutions (IADS) and Media Intelligence Solutions (MIS) – into Synodex and Agility, respectively. This marked the beginning of a series of changes in Innodata's representations of the nature of its business.

44. In the Company's next Form 10-K, filed on March 16, 2019 ("2018 10-K"), Innodata's description of itself morphed again, into a "global data engineering company" and it completely changed the description of its preexisting DDS segment. In the 2017 10-K, Innodata stated that DDS: "provides solutions to digital retailers, information services companies, publishers and enterprises that have one or more of the following broad business requirements: development of digital content (including e-books); development of new digital information products; and operational support of existing digital information products and systems." In contrast, in the 2018 10-K, DDS suddenly: "provides a range of solutions and platforms for solving complex data challenges that companies face when they seek to obtain the benefits of AI systems and analytics platforms. These include data annotation, data transformation, data curation and intelligent automation."

45. In only one year, the DDS segment completely changed from providing "solutions" for the development of digital content, new digital information products, and operational support

12

to providing "solutions and platforms" to address the "complex challenges" of AI including "data annotation, data transformation, data curation, and intelligent automation."

46.     Later, in the Company's Form 10-Q filed with the SEC on May 10, 2019, the DDS segment, described before in the 1Q2018 10-Q as providing solutions "by blending consulting, technology and global operations with deep domain expertise" shifted again to "combine human expertise with advanced deep learning technologies to power leading information products and enterprise AI (artificial intelligence)/digital transformation." The Company further represented that DDS specializes in "combining *artificial neural networks* and *human expertise* in multiple domains (including health, science, and law) to make "unstructured information" (sometimes referred to as "content") useable." Innodata elaborated that: "For business information companies, "useable" means that the content can be sold via subscription to a *digital product*. For enterprises, "useable" means that the content can drive *digital process transformation* and *AI*."

47.     Despite these seemingly major shifts in DDS, revenue for the segment declined during the Class Period. On a trailing twelve-month basis as of the third quarter of 2023, DDS only accounted for $80 million of revenue. DDS had its high watermark in 2012, with $85.4 million. More than a decade later, Innodata's topline revenue continues to fall short, even after acquisitions, including Agility in 2016, that helped conceal DDS's decline.

48.     In addition to major shifts in the DDS segment, the Synodex and Agility segments were also repackaged to investors after being renamed. Innodata's 2017 10-K represented that "[t]he main focus of the Synodex business is the extraction and classification of data from unstructured medical records in an innovative way to provide improved data service capabilities for insurance underwriting, insurance claims, medical records management and clinical trial support services." At this time, Synodex was a subsidiary of the IADS segment. The 2017 10-K

also represented that the MIS segment was comprised of Agility PR Solutions, which "provides media monitoring and analysis solutions and professional services" and Bulldog Reporter, a "news aggregation service."

49.    Over the next two years, although the segments had been renamed to Synodex and Agility, Innodata did not explain how their capabilities could have changed so drastically to include AI. Despite this, in the Company's Form 10-K filed with the SEC on March 16, 2020 (the "2019 10-K"), Innodata stated that both Synodex and Agility were "intelligent data platform[s]." By February 2023, Innodata was describing both Synodex and Agility as its "AI-enabled industry platforms." On March 23, 2023, Defendants touted the potential for Synodex's AI in the healthcare industry, stating, "The global artificial intelligence (AI) in healthcare market is forecast to reach a market size of $102.7 billion by 2028, up from $14.6 billion in 2023, with a CAGR of 47.6%" Unbeknownst to investors, Innodata was not poised to deliver in this highly lucrative and developing AI market.

50.    In addition to gradual changes in Innodata's representations of its existing business segments, the Company's introduction of "Innodata Labs," which the 2019 10-K represented as a "research and development center that developed and applied machine learning and emerging AI to our large-scale, human-intensive data operations," was sudden and did not include details of its operations throughout the Class Period At that time, Defendants stated that it was formed "approximately three years ago," yet Innodata only began referencing it in the prior year, in its 2018 10-K, filed with the SEC in March 2019.

51.    In 2021, Innodata also began representing that its platforms and services were "powered by Goldengate, our proprietary AI/ML platform[.]" Despite only beginning to mention AI in early 2018, Defendants Abuhoff and Spelker represented in March 2021 as follows:

14

> Over the past four years, we have built a technology infrastructure that automates complex data annotation and other data engineering tasks. Our technology infrastructure combines advanced dataflow, deep learning (a branch of AI), and purpose-built applications used by human experts, which we refer to as "workbenches". This infrastructure enables us to perform data annotation and other data engineering tasks at progressively higher levels of efficiency without compromising quality as it continuously learns from human experts.

52.    Also in March 2021, Defendants Abuhoff and Spelker touted Goldengate's AI capabilities, stating that it "is our core AI technology stack" and "serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms." Defendants Abuhoff and Spelker further stated that "one of the main benefits of the platform is that it's 'no-code', so it doesn't require a large number of data scientists to build models or require a data science platform to orchestrate models and update models." These representations were misleading to investors by creating the false impression about Innodata's AI capabilities and its continued reliance on offshore labor.

## C. Innodata Labs Was Not Developing AI and Innodata's Platforms Remained Dependent on Offshore Labor

53.    During the Class Period, Defendants advertised Innodata Labs as the source of the Company's AI development. The Company's 2022 10-K represented that "Innodata Labs researches and develops AI-based technologies that we utilize in our operations and with our customers" and that the "team is comprised of data scientists, including data scientists who have published leading papers on discrete topics in data science and have earned PhD degrees in fields such as data entity extraction." While investors were led to believe that Innodata Labs was a centerpiece of AI innovation, it was not developing AI as claimed.

54.    According to FE 2, Innodata Labs was "quite small." FE 2 was familiar with Goldengate and knew the head of Innodata Labs while FE 2 was employed at DDS. FE 2 recalled

that Innodata Labs was "quite small" and comprised of a team of "maybe eight, probably less." FE 2 knew this because FE 2 "had calls with them." FE 2 also stated that the head of Innodata Labs and Defendant Abuhoff "worked together closely." While FE 2 stated that they were not actively encouraged to exaggerate, Innodata "would do whatever it takes to get a customer."

55.     Subsequent changes to Innodata's business are inconsistent with a true AI company. Since 2019, Innodata's full-time offshore employee count has increased by approximately 15%. About 96% of its workforce is overseas and its average employee generates less than $20,000 in revenue annually. In contrast, Palantir Technologies, a company that similarly represents that it develops software driven by AI, generates more than $496,000 in annual revenue per employee.

56.     Innodata also does not employ a Chief Technology Officer, further demonstrating its lack of commitment to actual AI expertise. Rather, Innodata represented that in mid-2022, it formed an advisory board "dedicated to helping drive growth through innovation initiatives and advancing dialogue related to ethical AI and the future of AI technologies." In the two years since its supposed formation, the advisory board still only has two members. Moreover, the "data scientists" supposedly employed at Innodata Labs and the "product engineering teams" that are supposedly involved in Innodata's AI research and development were not even mentioned in the Company's SEC filings before 2023.

57.     To truly develop technologies as complex as AI, companies need to invest substantial amounts to research and development, as demonstrated by Microsoft and other large tech firms. Rather than increasing its investment in research as represented, Innodata steadily reduced its R&D spending during the Class Period. Since Innodata first reported R&D expense in 2019, it has spent a mere $4.4 million on it, which is only disclosed in its earnings releases between

the first quarter of 2020 and the first quarter of 2022. After the first quarter of 2022, Innodata stopped reporting its R&D budget. Innodata had steadily reduced its R&D spending up to that point, spending $1.35 million in 2019, $1.28 million in 2020, $1.28 million in 2021, and $500,000 in 2022.

58.     Innodata's property, plant, and equipment ("PP&E") metric dropped by about 12.7% year-over-year in the third quarter of 2023 to only $2.4 million. In contrast, its direct competitors raised over $180 million, most of which was invested in AI-capable servers or software development. In 2022, Innodata's spent a mere $400,000 on cloud services, even though the computing power needed for AI doubles every 100 days.

59.     Innodata's lack of spending on R&D, network infrastructure, or third-party cloud hosting services indicates that Innodata cannot in fact be offering a top-of-the-line AI platform. Instead, Defendants misrepresented the nature of offshore operations in relation to the Company's abilities in AI. Innodata's investors were unaware that humans from its preexisting DDS and Synodex segments, not AI, were still performing the bulk of Innodata's work, which was highly labor-intensive with cheap, offshore workers conducting data entry. The true center of Innodata's business is still its brigade of offshore employees, not proprietary AI.

60.     Despite the notable lack of expertise and investment, Innodata represented that it developed a "proprietary Goldengate AI platform" that was "state-of-the-art" and served as the Company's "core AI technology stack." In the 2022 10-K, Defendants represented that Goldengate "ingests unstructured data and performs a series of cognitive tasks to extract intelligence and create analytical data" and "serves up low-code AI with transfer learning[.]" It "serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms."

17

61.     The Company claimed that "using Goldengate in combination with our SMEs, we are able to build high-performing, cutting-edge models that address real-world problems. In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we commercialized it further as both a customer-facing technology and as the engine under other potential industry solutions." Although Goldengate was represented as AI technology, it was not actually AI.

62.     Before FE 1 joined Innodata, the content of a recruiter's message implied that Innodata was employing AI. After FE 1 was hired, FE 1 realized that Innodata's claims about AI were "b.s." and after speaking to the Company's Chief Product and Marketing Officer in 2019 and 2020, he realized that Innodata was taking "information from clients, sending the datasets overseas and letting employees get information after sifting through it." FE 1 continued, "They turned this dataset around to an offshore manual worker and then presented it as whatever. I began looking for another job almost immediately."

63.     At Innodata, FE 1's responsibilities largely consisted of contacting companies in the New York City area that might be interested in Innodata's products and services. There was no lead list to work from, and FE 1 was not told what kind of company would be a good candidate for FE 1 to target. FE 1 simply had to use their judgment and try to identify companies "that needed help with big datasets." FE 1 conducted this outreach to potential customers over LinkedIn. Innodata's Chief Product and Marketing Officer at the time told FE 1 that when contacting companies, FE 1 should introduce Innodata as a company with AI and machine learning capabilities.

64.     After an initial phone call, if a contact responded, FE 1 had a phone call with them. If they wanted to learn more, FE 1 connected the contact's technical employee with an employee

that Innodata labeled as an engineer. If a customer wanted to move forward after speaking to the engineer, FE 1 would have connected the customer with either the Chief Product and Marketing Officer or Defendant Abuhoff, who would "do the gladhanding" and negotiate a contract. FE 1 realized within two weeks of working at the Company that the product FE 1 was supposed to be selling was not enabled by AI or machine learning.

65.    During the time FE 1 was working at Innodata, the only clarity FE 1 achieved about the "product" they were selling was that it was "an AI training solution and service hours"— not software or any kind of AI-based solution. FE 1 first heard the phrase "service hours" from his boss, the Chief Product and Marketing Officer, just after being hired with two other new employees in the meeting as well. The Chief Product and Marketing Officer told them that customers sent "datasets" to Innodata for "annotation." Upon receipt by Innodata, the datasets were shipped off to workers based offshore.

66.    FE 1 was aware that there were workers in India and Sri Lanka who did annotations and was almost certain that the workers did not employ any kind of technology to do the annotations and that they did not use AI or machine learning. What the Chief Product and Marketing Officer said in the initial hire meeting made FE 1 skeptical because he did not discuss Innodata's service in a way that indicated that it used AI to do annotations. And he did not discuss the time that a customer saved by using Innodata's service or the increase in accuracy that Innodata's service provided— advantages that software powered by AI and machine learning offers. FE 1 expected "a platform to plug in or show off," when FE 1 was first hired, "but that's not what we were telling people it was." FE 1 reiterated that FE 1 never heard from the Chief Product and Marketing Officer that AI was integrated into what FE 1 and his coworkers were

19

promoting. When FE 1 asked the Chief Product and Marketing Officer what FE 1 was supposed to be selling, he reiterated, "We're selling service hours."

67.      FE 2 worked within the DDS segment and heard that Innodata's products were "machine learning-enabled and had AI-enabled technology to help with workflow solutions," but FE 2 "didn't know how deep the machine learning or AI was. Did they exaggerate reality? Yes," FE 2 said. These exaggerations were "more in the marketing spin."

68.      FE 2 described DDS as a business process outsourcing ("BPO") segment. This intrinsically made its services "commoditized." Additionally, "a lot of it was more manual than automatic," although "customers knew" that this was the case with FE 2's products. When FE 2 described what clients used DDS for, FE 2 said, "it wasn't just tagging. It was workflow situations—not tagging." FE 2 recalled that customers did complain about wishing to see specific features in the products they contracted for. When this happened, FE 2 "pulled in an expert" on the software development side to work with the customer. Even with that individual attention, however, there were a few times that customers left DDS because they "were not getting the improvements they wanted," FE 2 recalled.

69.      FE 2 stated that lack of customer loyalty was inherent to the BPO industry and the contracts between customers and BPO service providers are not long-term. "It's standard in the industry" for the contracts to be short. The contracts FE 2 worked with at DDS were just one year, "with a 30-day notice." This created intense pressure on FE 2 to serve customers' whims. "You had to find an edge or you would lose."

70.      FE 2 stated that the sales goals were "unattainable." There was an internal spreadsheet used to track contracting activity and FE 2 attended weekly team sales meetings by phone, which Defendant Abuhoff sometimes attended by phone. It was clear to FE 2 that DDS's

revenue was declining based on the quarterly business reviews FE 2 attended for each of their accounts. At those reviews, there were discussions about the revenues from DDS' clients and "everyone knew the numbers were going down."

71.    FE 2 also traveled with the Chief Product and Marketing Officer to visit Innodata's offshore operations in Asia. The software engineers were all based in India, the Philippines and Sri Lanka and numbered in the "thousands."

72.    FE 3 worked in the Agility segment and stated that Agility likewise did not have AI-powered technology. FE 3 explained, "We [the humans] were the AI," and "were putting the information in" the Agility system. According to FE 3, the process of putting information on the Agility platform and identifying new potential customers was essentially manual.

73.    To demonstrate Agility in new customer trials, FE 3 used the Sales Navigator feature on LinkedIn to identify new potential contacts, or people posting on LinkedIn about the industry the customer was involved in. Once Sales Navigator had scraped websites such as LinkedIn for the relevant names and contact information for potential people the client could reach out to, FE 3 had to "import" that information to a platform and then transferred the information from that platform to a platform within Agility. FE 3 recalled having to use "five different platforms" to move information from the internet onto Agility to make it so that the client could use it to communicate with its customers. FE 3 said the process was so cumbersome that FE 3 spent approximately 50 percent of work hours performing the information-identification and upload tasks.

74.    After the trial, if the customer agreed to become a user of Agility, the process of identifying potential contacts and uploading them onto the Agility platform became the responsibility of the account manager who had signed the customer. And sometimes the customers

21

themselves uploaded information onto the Agility platform. FE 3 did not see the point of the Agility product or the communications that were disseminated by Agility's customers. "If you had enough people loading information onto the platform, it worked. But it was scammy, and it was junk emails you didn't really want," FE 3 said about the communications that recipients received from Agility's customers. They "thought it was an AI generator that was worldwide, taking information without us having to put it in. That's how [our managers] pitched it to us, and that's how we practiced to sell it," FE 3 said.

75.     FE 3 was put through a three-month training program after being hired and was told the Agility platform they were selling was AI-powered. FE 3 was told to practice the AI-powered aspect of the product in the pitches to clients. In a meeting with "managers who managed account managers" in October 2022, FE 3 told them that the "platform was confusing" and that FE 3 had noticed "the only data was what I put on there," and that FE 3 "thought there must a better way to use it correctly." The manager had no response to these concerns.

76.     Innodata has been able to pose as an AI company as a result of contracts with true AI companies to use its DDS segment to outsource the labor intensive, often one-time job of structuring and targeting previously unstructured data to be used to train Large Language Models. Innodata and Defendant Abuhoff referred to these contracts as "transformational" but concealed their true nature and viability. Investors were unaware that these contracts were one-time contracts that would not lead to recurring results.

77.     In addition to the lack of Chief Technology Officer, Innodata's CFO slot has been a revolving door. Six individuals have held in the role since 2017. Defendant Espineli, still acting as interim CFO two years after her initial appointment, was preceded by Mark Spelker, who resigned after holding the position for only 17 months. After his resignation, Innodata revealed

22

that his employment had only been part-time. Before Spelker's appointment, the prior CFO, Robert O'Connor was only in the position for about one year, from April 17, 2019 to October 8, 2020.

78.     Innodata also uses BDO India LLP as its auditor, even though about 70% of the Company's revenue comes from United States customers, with most of the remainder located in Canada and Europe. The engagement partner for Innodata at BDO is Anita Somani, who does not appear to audit any other public companies in the same senior role.

79.     In early February 2024, Innodata attempted to acquire Appen Limited, an Australian company that has over 1,000 overseas employees and has helped train AI models for major technology companies including Microsoft, Apple, Meta, Google, and Amazon. Appen recently struggled with executive departures and a loss of business in the new generative AI landscape. Innodata submitted a confidential, non-binding proposal to acquire all shares of Aspen for $154 million but withdrew the proposal in March 2024 after Appen breached its confidentiality condition.

80.     During both Appen and Innodata's growth years, manual collection of data was in higher demand, but now, LLMs have changed the relevance of both companies' offerings. The underlying models behind new generative AI models such as ChatGPT can scour the digital universe to provide sophisticated answers and advanced images in response to simple text queries. To fuel LLMs, which are powered largely by advanced processors from Nvidia, tech companies are spending less on companies like Appen and more on competitive services that already specialize in generative AI.

81.     Innodata's acquisition of Appen would have resulted in more of the same business issues that caused Appen to struggle in the first place. Appen has a platform of over 1,000 overseas workers and has used that network to train some of the world's leading AI systems. If Innodata

really had "AI-enabled platforms" and had deals with large tech companies as represented, it would not have needed to spend $154 million to acquire Appen.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

82. As a result of Defendants' fraudulent scheme described above, Defendants knew, or recklessly disregarded, that the following statements to Innodata investors were materially false and misleading and/or omitted to state material facts necessary to make those statements not misleading.

83. The Class Period starts on May 9, 2019, when Innodata held an earnings call about its reported financial results for its fiscal 2019 first quarter. On the call, Defendant Abuhoff represented to investors that Innodata's internal AI development was ready to be deployed externally and that it was the key to repositioning Innodata's core business, stating:

> Our plan for the year is to try to hold revenue at roughly the same level as last year in DDS, while at the same time doing the necessary heavy lifting to reposition the core business for growth next year. *The key enabler to our repositioning will be certain AI technologies that we developed and validated internally for the past 2 years.* These technologies contributed to our turnaround last year, in which we increased our adjusted EBITDA at the end of 2018 to the highest that it has been as a percentage of revenue since 2014.
>
> *That having been accomplished, we now believe we can turn our AI focus externally, building these tested technologies into market-facing services and product offerings, designed around helping enterprises integrate AI into events, document and content transformation, which in turn are expected to increase revenues and drive growth for us.* To accomplish this, we've brought on senior-level product management marketing talent, who will be working closely with our AI engineering team. We're enthusiastic about the work that's going on now. By the end of this year, you'll see clearly the repositioning that will have resulted from their work.

84. The italicized statements referenced above in ¶83 were materially misleading and omitted to disclose material facts when made. Innodata had not "developed and validated" AI technologies for the past two years and was not ready to "turn our AI focus externally" to increase

24

revenues and drive growth. FE 1 realized within two weeks of working at the Company that the product FE 1 was supposed to be selling was not enabled by AI or machine learning. FE 2 worked in DDS and also confirmed that Innodata would exaggerate reality in the marketing spin. FE 3 worked in the Agility segment and stated that Agility likewise did not have AI-powered technology but was instead powered by humans putting information on the Agility platform. Innodata did not have the necessary resources or capabilities to develop AI. Instead, clients were contracting with Innodata to outsource the labor-intensive, often one-time job of structuring and tagging previously unstructured data to train LLMs.

85.    Defendant Abuhoff further stated: "At the same time, in 2019, we're working on exciting strategy to turn our AI development into market facing product to fundamentally reposition the core business for sustained growth." In response to an analyst's question about the fundamental advantage of their new AI with customers, Defendant Abuhoff stated:

> ***What we're able to do with our AI is we are able to make that process much less people intensive***. And to make those documents readable by computers, and that's the key thing. I mean that's really about what we've been doing in our Synodex business, our docGenix business. It's what we've been doing in our core business to produce publishable product for large information providers. So what we're doing now is we are saying okay.
>
> Where are there problems out there in the world in enterprises, where people are still contending with the fact that there is effectively non-digital data. ***There's data that computers can't read real well, and we've trained AI models to be able to dramatically reduce the human intervention required to make those machine readable. And we have the capabilities now and we're learning to know how to mix AI with human expertise to achieve a very efficient and very high-quality result***. So we brought on the product manager, who was product manager at IBM Watson. He's very intrigued by what we are doing. He thinks there's a lot of applicability in the market. We've brought on a marketing lead from another high-profile company, and they're working on productizing those things.

86.    The italicized statements referenced above in ¶85 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have AI technology and was not "dramatically" reducing human intervention. Innodata did not

have the necessary resources or capabilities to develop AI and FE 3 confirmed that Agility was powered by humans.

87.     During an earnings call on August 8, 2019, Defendant Abuhoff stated: "In our DDS business, we used our expertise in machine learning and AI to drive significant costs out of that business, and that process is still ongoing." In response to an analyst's question about the scope of Innodata's AI business, Defendant Abuhoff further stated:

> *So the AI that – we're using AI in all of our businesses*. That's going to be part of our strategy. *But for the most of the AI investments that we've made has actually been in our core business, and we used that investment early on in order to drive operational excellence and help us with our cost rationalization and turnaround of that business last year. Now what we're doing is we're building that into market-facing products that will help us expand our addressable market*. I think one of the limiting factors that we've had has been the size of our addressable market. And given what's going on in the world today, how businesses are integrating AI, is an essential core strategy. But they need accurate comprehensive data in order to drive the intelligent predictions that they're looking for as outcomes. There's an opportunity for us to significantly break out of that rather small addressable market. On top of that, the types of technologies and the things that we're developing also have applicability in our core market. So we very much value the customers that we've got and the kind of customer base that we've got, and we're going to be able to address their needs as well as break out and expand those addressable markets.

88.     In response to an analyst's follow-up question about whether Innodata has "gotten any new business in AI specifically[,]" Defendant Abuhoff stated: "Yes, we have."

89.     The italicized statements referenced above in ¶¶87, 88 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have AI technology and was not making investments in AI.

90.     During an earnings call on November 7, 2019, Defendant Abuhoff stated:

> *And over the past couple of years, we've been harnessing AI and machine learning capabilities*. The AI/ML revolution that is transforming every company in every industry is still in his first or second inning, and exponential and accelerating growth is expected. Our history of expertise in managing, curating and securely processing large amounts of data and harnessing AI has positioned us ideally to take advantage of this secular trend.

26

*For the last 2 years, we've been on a path of transforming our business in order to become a leader in these fast-growing markets. This journey began with us creating AI-based solutions for our own internal use, and our success here enabled us to remove several million dollars of costs of manual human labor, management and infrastructure, while at the same time, improving the quality of our offerings.*

*Our success with developing these AI capabilities has now enabled us to package them as solutions that we can take to a wider range of industries and applications.* And we are seeing an excellent response from the marketplace. *By way of example, we are on track to close this year over $1 million of opportunities for the new services listed on our website with companies that are outside our traditional publishing sector.*

In 2008, we brought in only 9 new clients from outside our traditional publishing sector. But in just the last 2 months alone, we have put in place pilots and pipeline with a multiple of that. We're either in pilot or discussing pilots with financial services companies, healthcare companies, media conglomerates and others as well. Our marketing team, which we expanded significantly this year in order to power our transformation, is really hitting its stride. Year-to-date, we've driven close to 10,000 warm leads with a variety of marketing programs across our segments.

91.    The italicized statements referenced above in ¶90 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have "success with developing these AI capabilities" but rather lacked any expertise in AI and had not implemented AI into any of its business segments.

92.    In response to an analyst's question about Innodata's skill set and expertise regarding AI, Defendant Abuhoff further stated:

If you take a look at our new website, what you'll see is we do several things with artificial intelligence, starting with helping people build their AI models. *So there are people who are building AI models, they need to train those models. And what they need is a combination of AI, human expertise and a secure data infrastructure in which to do that. We bring all that to the table.*

In addition to that and on top of that, we're looking at data transformation and data curation. *And when we're performing data transformation, data curation for people, we're using the AI models that we've built, oftentimes working with the frameworks that are produced by some of the very large companies. But they are models that we've built and that we've engineered, we maintain and we manage, that turn documents that people now read into data that computers can read.*

27

> *We're helping to curate data, master data that's at the core of companies' success, like CRM data, that again works with the combination of our trained experts and our robust trained AI models.*

93.     The italicized statements referenced above in ¶92 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata had not "built" AI models. Innodata did not have the necessary resources or capabilities to develop AI, and had not integrated AI into its business platforms.

94.     In a conference call on March 12, 2020, in response to an analyst's question about expanding in AI, Defendant Abuhoff stated:

> *We're working with the leading information providers, applying AI to continent operations on their behalf. And we're receiving very good market recognition in those markets for having done that.* There's a lot of excitement about what we're doing. But I do think the real story here is that we've -- through that effort, we've -- and most notably, the investments we've made over the past 3 years in AI being applied to those kinds of challenges, we're now very well positioned to pivot to these larger markets, or to, I should say, embrace these larger markets.

95.     The italicized statements referenced above in ¶94 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata was not "applying AI[,]" rather, companies that actually apply AI contracted with Innodata's DDS segment to outsource the labor-intensive, often one-time job of structuring and tagging previously unstructured data to train LLMs.

96.     In a conference call on May 14, 2020, Defendant Abuhoff stated: "Last year, as you recall, *we pivoted the company from a publishing services provider to a data engineering company, rolling out new products and solutions to help companies in wider markets, prepare data for AI and put AI to work in their businesses*." Defendant Abuhoff further advertised that "*[w]ith our AI, focus, our pipeline soon grew* to include banks, hedge funds, online trading platforms and financial services firms as well as drug companies, drone companies, software companies and even movie studios."

97.    The italicized statements referenced above in ¶96 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not "pivot" to a "data engineering company" in the way that was represented to investors. Innodata did not actually develop AI but instead was being used to outsource the job of structuring and tagging data, which would not lead to sustainable revenue.

98.    In a conference call on August 6, 2020, Defendant Abuhoff stated:

AI data preparation includes collecting, cleaning and normalizing data as well as annotating classifying and segmenting data. And these are precisely the things that we believe we're the best in the world of providing. But we've traditionally provided them for a small market. Now a new, much larger market is emerging. Given our history of being the leading provider of high-quality data to leading legal financial and medical information companies, we see a clear task to becoming a leading provider of AI data preparation and annotation to companies that are seeking to build models in these and other areas.

*We only started marketing and selling AI data prep and annotation services in Q4 of last year. Nevertheless, to date, we have closed 15 new customers. We have another 16 customers in late-stage pipeline that are expected to close in the second half. We are forecasting a total of $3.5 billion in bookings -- excuse me, $3.5 million of bookings from this market this year, and we're expecting that a majority of these deals will produce recurring managed services revenue at our target margins.* We have also identified opportunities to license our data annotation platform, which is a customer-facing version of our internal production platform that we have refined over many years.

*It is worth mentioning that one of our recent data annotation wins is with a prominent big tech company. To secure this work, we beat out 7 incumbents, winning the business based on our quality and our capabilities.* Our current pipeline includes banks, hedge funds, online trading platforms, financial research firms as well as drug companies, drone companies, AI software companies and 2 big tech companies.

99.    The italicized statements referenced above in ¶98 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata was not winning sustainable AI revenue with big tech companies but was rather being contracted to outsource the one-time job of structuring and tagging data.

29

100.    During an earnings call on November 12, 2020, Defendant Abuhoff affirmed Innodata's progress in AI, stating:

Let me give you some color on what we are seeing and executing on the ground. In our core digital solutions business, ***we are now primarily focused on the AI data preparation market that was estimated $1.9 billion this year and is expected to grow to $3.2 billion by 2023.*** We believe that this is a made-to-order market for us in which customers prize data quality above anything else, which means we're able to bring to the task our 25 years of finely honed skills and technology that we developed to create near-perfect data for leading information companies.

***As a result, we're winning deals in the AI data preparation market against several incumbent providers. We launched our AI data preparation offering late in Q4 last year. And to date, we have closed 18 new customers, and we have another 20-or-so in our late-stage pipeline.*** By the time the year is done, we expect our DDS segment to have signed approximately 40% more new business than it did last year.

As an example of our execution in this segment, one of the world's largest social media companies became our client in Q2 when we beat out 17 other companies in a highly competitive 5-month long RFP. ***In just 5 months, we've become one of this company's preferred vendors, and we're now running multiple projects across 7 languages. Our scope includes AI-based search classification to improve the search experience, sentiment analysis to automate content filtering, product classification engines to improve product placement for advertising, trend representation to identify trending topics on the platform, toxicity identification algorithms to identify content that violates terms of service and misinformation identification to auto identify fake and misleading information.***

101.    The italicized statements referenced above in ¶100 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata's scope did not include "AI-based search classification" because Innodata did not develop AI and its platforms were powered by humans. Innodata was not winning sustainable AI-based revenue but was instead being contracted to outsource the one-time job of structuring and tagging data.

102.    During an earnings conference call on March 11, 2021, Defendant Abuhoff advertised the new Goldengate platform to investors, stating:

Second, we have been building a proprietary AI platform we call Golden Gate. In a nutshell, Golden Gate "reads documents and text and tells you what the documents are about." Golden Gate accepts any kind of documents, images, PDFs

or web copy, it doesn't matter. ***And it performs a series of cognitive tasks to extract intelligence that people can use for generating inferences and powering analytical applications.***

***In terms of AI, it is truly state of the art, serving up no-code AI with transfer learn built on generative language models we have developed and perfected over the past 5 years of deploying industrial deep neural networks. Golden Gate will be the AI under the hood that powers our data annotation platform and brings AI capabilities to our industry platforms like Synodex and Agility***.

***Golden Gate will also be the foundational technology for work we perform for customers. The main benefits of the platform is that it's no code, so it doesn't require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Golden Gate in combination with our SMEs, we were able to build high-performing cutting-edge models that address real-world problems.***

103. The italicized statements referenced above in ¶102 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata Labs, which had developed a unique AI technology, did not have the necessary resources to develop AI and the Company had not increased spending on research and development. The at Innodata Labs only consisted of eight employees, and that at least four of those employees have since left the Company. Instead, companies that actually develop AI contracted with Innodata's DDS segment to outsource the labor-intensive, often one-time job of structuring and tagging data.

104. On the same call, in response to an analyst's question about how Innodata uses AI, Defendant Abuhoff further advertised Goldengate, stating:

***So we've built Golden Gate, which is cutting-edge AI.*** We're combining that with our subject matter experts, people that we might have, in earlier days, used to do things like ebook search. ***But now we're combining those people with the Golden Gate technology to create cutting edge, high-performing AI models and very high-quality data that can be used to train those models.*** And we're doing that in 3 layers. We're doing that for people who need high-quality data to train their own models. We're doing that for people who don't have the data sciences' team but want AI solutions to help them run their businesses better. And then we're also taking that AI and we're building that into industrial platforms like Synodex and Agility will soon be that are powered by AI.

31

So it's very much tethered in our legacy, in our history of having subject matter experts accessible to us around the world. And it's very much tethered in our culture of data quality -- of being fanatical about data quality of having the processes and technology to create that high-quality data. *And now instead of delivering back to the market ebooks, we're delivering to them high-quality training data. We're delivering to them AI solutions, things programmed with data. And we're delivering AI industry platforms that generalize the AI into platforms that do things for people that they require to be done in order to run their businesses better.*

105. The italicized statements referenced above in ¶104 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata did not build "cutting-edge AI." Instead, clients contracted with Innodata's DDS segment to outsource the labor-intensive, often one-time job of structuring and tagging data.

106. On March 12, 2021, Innodata filed its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). In the 2020 10-K, Defendants Innodata, Abuhoff, and Spelker stated:

> *Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.* Goldengate accepts a wide range of documents –including images, PDFs, and web copy – and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. *It serves up no-code AI with transfer learning built on generative language models we have developed over the past five years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.*

107. The italicized statements referenced above in ¶106 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Goldengate was not Innodata's "core AI technology stack." Innodata did not have a viable AI and was not effectively developing the technology.

108. In a conference call on May 6, 2021, Defendant Abuhoff stated: "we're also seeing an increase in deal sizes generally. For example, our pipeline includes a large global technology company that spends tens of millions of dollars on AI initiatives annually." In response to an

32

analyst's question about Innodata's skill set for creating AI, Defendant Abuhoff stated in pertinent part:

So I think as you know, we started building and working with AI about 5 years ago. We did a lot of work internally with it, and ***we built some high-performing systems that are working very, very well for us. We turn those systems into external market-facing capabilities, and we started to bring those to market last year, and we're continuing that this year. And we're finding that our combination of very high-performing AI stack that has been trained through lots of content development work that we've done, in combination with our global reach in terms of subject matter expertise and humans in the loop that can work with our technology to create high-performing training data for our customers and create very compelling outcomes in terms of applied AI, is really the perfect combination to be competing in the world.***

109.    The italicized statements referenced above in ¶108 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not build "high-performing AI" but was instead attempting to capitalize on AI buzzwords. Innodata did not have the necessary resources or capabilities to develop AI.

110.    During an earnings conference call on August 5, 2021, Defendant Abuhoff again touted the Innodata's progress in AI, stating:

The AI initiatives we're working on fall basically into 2 categories. ***First category are AI implementations that help organizations modernize or streamline processes. The second category are AI implementations that deliver fundamentally new experiences.*** We're now working on AI implementations with 2 of the largest Silicon Valley tech companies, and we have discussions taking place with 3 others.

We're working with about 14 large enterprises and have late-stage pipeline discussions in the works with another 12 or so. And we're working with 15 early stage companies, and we've got about 20 others that are proceeding at pace. We believe that over the next several years, AI implementations, which up until now have largely been the domain of Big Tech Silicon Valley will increase significantly among early adopter and early majority organizations following the classic technology adoption curve, and hastened by the dramatic improvements in broadband networks and mobile device chipsets as well as the maturity of AI/ML development tools and the increasing trend for organizations to invest in data science. As this occurs, AI will start to become embedded in everything that we do and everything that we use. We believe that the net result of this will be an increasing demand for domain-specific high-quality training data and models.

111.    The italicized statements referenced above in ¶110 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata was not winning sustainable AI-based revenue but was instead being contracted to outsource the one-time job of structuring and tagging data.

112.    In response to an analyst's question about the "flywheel characterization synonymous with AI technology" in an earnings call on November 4, 2021, Defendant Abuhoff stated in pertinent part:

> So what's very exciting to us is a couple of things. ***First, we've created an AI platform that we've trained with a lot of data.*** We're a data company. We've got a lot of data. ***So we've trained our algorithms to perform very, very well. We're building those algorithms. We're embedding them into many of our platforms, all of our new platforms for sure.***
>
> ***We're deploying those as accelerators for many of our existing clients, enabling to get better results and more accurate results.*** And just like you say, as we keep going down that journey, our performance only gets better. And as it gets better, our customers like us more. As they like us more, they give us new work to do. As the algorithms perform better and more use cases become presentable and become actionable, then that creates more market opportunity.

113.    The italicized statements referenced above in ¶112 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata had not "created an AI platform" because Innodata Labs did not have the necessary resources to develop AI and the Company had not increased spending on research and development. The team at Innodata Labs only consisted of eight employees, and that at least four of those employees have since left the Company. Instead, clients were interested in the one-time job of outsourcing data structuring and tagging.

114.    In an earnings call on March 17, 2022, Defendant Abuhoff stated:

> Here's a recent very important win. ***One of the largest Fortune 50 semiconductor manufacturers selected us to build fully-trained deep-learning AI models for automated retail and manufacturing solutions. This is an example of end-to-end***

34

> *AI services from synthetic data creation to model training and model management.*
>
> \* \* \*
>
> In addition, ***our plan calls for us to develop additional SaaS platform products that encapsulate our proprietary AI*** in order to reimagine legacy, slow and inefficient knowledge-based processes. Of course, we are laser-focused on execution to ensure that we capitalize on the opportunities in our industry and position the company to be ahead of the curve in terms of our customer needs.

115. In response to an analyst's question about Innodata's value, Defendant Abuhoff stated: "[t]he other thing that we've got going for us that is distinguishing us in the competitive landscape is our ***full-service AI capabilities***. So we're able to demonstrate to them technologies that make the process of creating high-quality data more effective and efficient. ***We're able to show them our platforms***." Defendant Abuhoff further advertised: "***The cool thing is we're able to start them out with high performance because of the way we built our AI technologies***. There's a lot of transferred learning, it's called. They work quickly immediately on new tasks. But then as they become trained on those specific customer-specific tasks, they contribute more and more value as that goes forward."

116. The italicized statements referenced above in ¶¶114, 115 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have "proprietary AI" and had not built AI because Innodata Labs did not have the necessary resources to develop AI and the Company had not increased spending on research and development.

117. On March 24, 2022, Innodata filed its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). In the 2021 10-K, Defendants Innodata, Abuhoff, and Espineli stated: "***Our platforms and services are powered by Goldengate, our proprietary AI/ML platform, as well as other technologies we have developed***." They further stated:

*Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.* Goldengate accepts a wide range of documents – including images, PDFs, and web copy – and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. *It serves up no-code AI with transfer learning built on generative language models we have developed over the past six years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.* One of the main benefits of the platform is that it's "no-code", so it doesn't require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Goldengate in combination with our SMEs, we are able to build high-performing, cutting-edge models that address real-world problems. *In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we intend to commercialize it further as both a customer-facing technology and as the engine under other potential industry solutions.*

118.    The italicized statements referenced above in ¶117 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata did not have AI technology and did not have the necessary resources or capabilities to develop AI.

119.    During an earnings call on May 12, 2022, Defendant Abuhoff stated:

On the product front, we also made great progress in just the last 8 weeks. *We launched our AI-enabled document intelligence platform in late March as planned. This new customer-facing platform uses our proprietary Goldengate AI technology to automatically extract meaning from complex documents.* It can be utilized across domains, from health care to financial services to media and entertainment, essentially any business that employs people to read or manage complex documents. Initial feedback from our customers has been positive, and we are in the late stages with 2 opportunities, which taken together, we believe will be worth approximately $1 million per year in likely recurring revenue.

120.    The italicized statements referenced above in ¶119 were materially misleading and omitted to disclose material facts when made for the reasons explained ¶¶84, 103. Innodata did not have AI technology and did not have the necessary resources or capabilities to develop AI.

121.    In an earnings call on August 11, 2022, Defendant Abuhoff stated: "We also have made investments in commercializing our *proprietary Goldengate AI technology stack in the form of an AI data annotation platform, an AI document intelligence platform and industry*

36

*solutions that utilize our AI to enable customers to do deeper analytics and textual data and documents with fewer people.*" Defendant Abuhoff further stated: "We launched our AI-enabled document intelligence platform in late March as planned. *This new customer-facing platform uses our Goldengate AI technology to automatically extract meaning from complex documents. It can be utilized across domains, from health care to financial services to media and entertainment, essentially any business that employs people to read or manage complex documents.*"

122.    The italicized statements referenced above in ¶121 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata did not have AI technology and did not have the necessary resources or capabilities to develop AI.

123.    In an earnings call on November 10, 2022, Defendant Abuhoff stated:

Forrester recently recommended companies maintained spending on AI initiatives despite a potentially deep recession looming in order to increase efficiency and stay competitive. And in a recent survey, more than 75% of technology leaders said that they expect their firms to be spending more on technology this year, notwithstanding economic uncertainty with investments focused on cloud computing, machine learning, artificial intelligence, and automation. *Outside these transitory issues, we believe our business continues to build momentum. We now have 10 large customers for our AI ML life cycle services, which we believe will increase their spend with us in 2023, some significantly based on our current line of sight.*

Many of these companies have revenues in multiple billions of dollars. In the third quarter, we brought on 4 of these customers. *The use cases we're landing include facial recognition, retail anomaly detection, automation, chatbots, security monitoring and voice-to-text.* Indeed, we're hoping to be in a position to announce several additional important wins and expansions with Visa and other customers by year-end. Our Synodex business, which enjoys a net retention of over 150% is also rapidly onboarding new customers. Just yesterday, we announced 2 new customer wins for our Synodex platform that we believe will together yield approximately $1.1 million of annualized recurring revenue. We also expanded the value of the Synodex engagement from an estimated $1.8 million to $2.3 million of anticipated annual recurring revenue as we began ramping up this engagement this month.

37

124.    The italicized statements referenced above in ¶123 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have AI technology, facial recognition, or chatbot capabilities. Innodata did not have the necessary resources or capabilities to develop AI and its platforms were dependent on offshore labor.

125.    During the same earning's call, in response to an analyst's question about developing language models, Defendant Abuhoff stated:

> Sure. Just a few things there. ***First of all, we developed a high-performing language model for this customer to enable them to integrate it into their operations to begin to automate certain tasks that are tests that are important to them.*** We think the work we're doing there is very representative of what businesses are all going to have to face, which is a world where UI is folded into their operations, and every professional starts to look at, regardless of domain, look at AI as something that's constantly running in the background, acting as a copilot, helping them along in whatever it is that they do.
>
> So the work that we've done there is very much oriented to figuring out, well, how do we integrate the technology into their environment, and then once we do that, how do we present that capability to humans? How do we augment the work that humans do in an appropriate way. And I think we're -- as we do work like this, we're figuring out a lot of things of kind of first impression. We're creating blueprints that are replicable across businesses that we work with, which is super exciting.
>
> Inevitably, what we have to do when we demonstrate that we can build a model that works for someone as well then the next thing is we've got legacy client-server applications and legacy databases, which are not cloud-enabled that need to be migrated to benefit from the AIML. So that becomes additional scope that we're able to do. For this particular customer, we see that work ahead of us, along with additional migration work as well as additional models because they're getting very good results with what we've built so far.

126.    In response to an analyst's immediate follow-up question about whether "that would be recurring revenue," Defendant Abuhoff stated:

> It will be a combination*. **So there'll be recurring revenue in terms of the ongoing management and optimization of the ML, There'll be one-time revenue in terms of cloud migration. But we think that there'll be recurring customer revenue in terms of migrations because we do believe that that will continue for a while. And then pure recurring revenue from MO models because there's always the need to***

*be retraining and reoptimizing the models to comport with heterogeneous data that's coming into the company.*

127.    The italicized statements referenced above in ¶¶125, 126 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata was not developing language models for customers, but was instead providing offshore labor to train other companies' language models.

128.    On February 23, 2023, Innodata filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). In the 2022 10-K, Defendants Innodata, Abuhoff, and Espineli stated: "We develop custom AI models (where we select the appropriate algorithms, tune hyperparameters, train and validate the models, and update the models as required)" and "*in addition to deploying and integrating AI models*, we often provide a range of data engineering support services including data transformation, data curation, data hygiene, data consolidation, data extraction, data compliance, and master data management." They further stated:

> *Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack.* Goldengate ingests unstructured data and performs a series of cognitive tasks to extract intelligence and create analytical data that people can use for generating inferences and powering analytical applications. *It serves up low-code AI with transfer learning, orchestrating generative LLMs we have developed over the past seven years of deploying industrial deep neural networks as well as third-party foundation models.* It integrates both with our internal systems and customer environments through application programming interfaces ("APIs").

> *Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms.* One of the main benefits of the platform is that it is "low-code", so it does not require a large number of data scientists to build models or require a data science platform to orchestrate models and update models. Using Goldengate in combination with our SMEs, we are able to build high-performing, cutting-edge models that address real-world problems. *In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we commercialized it further as both a customer-facing technology and as the engine under other potential industry solutions.*

129.    The 2022 10-K also touted Innodata's research and development in AI, stating:

39

*Our Innodata Labs researches and develops AI-based technologies that we utilize in our operations and with our customers.* The Innodata Labs team is comprised of data scientists, including data scientists who have published leading papers on discrete topics in data science and have earned PhD degrees in fields such as data entity extraction.

Our product engineering teams also engage in research and development efforts focused on enhancing the functionality and utility of our AI industry platforms, addressing new use cases and developing additional innovative technologies. Timely development of new functionality to support existing and new use cases is essential to maintaining our competitive position, and we release new versions of our software on a regular basis.

Customer feedback enables us to ensure that we stay aligned to our customers' priorities and that we stay ahead of market needs. Our culture of innovation helps us attract and retain a highly motivated and talented team of AI experts and technologists. Our research and development center spans several geographical locations across North America and Asia-Pacific.

In mid-2022, we formed an Advisory Board dedicated to helping drive growth through innovation initiatives and advancing dialogue related to ethical AI and the future of AI technologies. The advisory board is currently comprised by a Chief Data Officer for Microsoft and the director of University of Michigan's Artificial Intelligence Laboratory. We are presently seeking additional members.

130.    The italicized statements referenced above in ¶128, 129 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata Labs did not have the necessary resources to develop AI and the Company had not increased spending on research and development. The team at Innodata Labs only consisted of eight employees, and that at least four of those employees have since left the Company. Instead, clients have contracted with Innodata's DDS segment to outsource the labor-intensive, often one-time job of structuring and tagging previously unstructured data so it can train their LLMs.

131.    In the same 2022 10-K, Defendants Innodata, Abuhoff, and Espineli stated:

We developed our capabilities and honed our approaches progressively over the last 30 years creating high-quality data for many of the world's most demanding information companies. Approximately seven years ago, we formed Innodata Labs, a research and development center, *to research, develop and apply machine learning and emerging AI to our large-scale, human-intensive data operations.* In 2019, we began packaging the capabilities that emerged from our R&D efforts

40

in order to align with several fast-growing new markets and help companies use AI/ML to drive performance benefits and business insights.

*Our historical core competency in high-quality data, combined with these R&D efforts in applied AI, created the foundation for the evolution of our offerings, which include AI Data Preparation, AI Model Deployment and Integration, and AI-Enabled Industry Platforms*.

132.    The italicized statements referenced above in ¶131 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 130. Innodata did not have the necessary resources or capabilities to develop AI.

133.    In an earnings call on February 23, 2023, Defendant Abuhoff stated:

Early in the first quarter of 2023, a large financial technology company expanded scope with us to leverage our proprietary AI models more fully and reengineer their technology for the cloud to drive operational efficiencies. *Our proprietary AI engine, Goldengate, uses the same underlying encoder-decoder transformer neural network architecture as GPT.* While GPT is trained broadly, Goldengate is trained narrowly on specific tasks and domains. We have experimented with coupling GPT and Goldengate, and this seems to result in even higher orders of performance. This is the third scope expansion we've had with this company over the course of the past 6 months, again, providing further validation of our land-and-expand strategy.

*We believe our third opportunity is to harness GPT and other large language models in our own AI industry platforms. Just last month, we announced PR CoPilot, a new module within our Agility PR platform that combines proprietary Innodata technology and GPT to enable communications professionals to generate first draft of press releases and media outreach in record time.*

With our release of PR CoPilot, we became, we believe, the PR industry's first integrated platform to incorporate large language model technology. The implementation was significant for Innodata, and we received a supportive write-up in PR weekly for it. The start-up named Jasper vaulted to unicorn status when it implemented something very similar to PR CoPilot for creating blogs and social media postings. Their efforts got them a $125 million Series A round on a healthy $1.5 billion valuation.

With respect to our Agility platform, we're seeing positive momentum in key performance indicators, which we think PR CoPilot and our newly integrated social media listening product will help to further accelerate. In Q4, Agility platform sales grew 6% over Q3, which annualizes to a roughly 26% growth rate.

41

134.    The italicized statements referenced above in ¶133 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata did not have AI technology and did not have the necessary resources or capabilities to develop AI.

135.    During a conference call on May 11, 2023, Defendant Abuhoff stated: "over the past several years, *we have been integrating both generative and classical AI into real-world customer operations, workflows and platforms*." In response to an analyst's question about Synodex and Agility, Defendant Abuhoff further touted PR CoPilot, stating: "*We built the PR CoPilot, the generative AI model that we launched within the platform in January.* It was the first mover within that industry. *We've got great strong customer reception, a super cool road map for successive releases around that this year*."

136.    On the same conference call, in response to an analyst's question about whether there is a difference between Microsoft's supposed annotation in "Kenya for $3 an hour" and Innodata's own annotation, Defendant Abuhoff stated:

> *Yes, there is. There's a great deal of difference. Some of the early models that have been built kind of go very broad, but very narrow. There's not a great deal of annotation that's required. Much of what we do is the complex stuff. It's going deep into subject-matter domains. It's going deep into use cases*. I think it's the next phase of what will be required, both among the large tech companies as well as other companies that are looking to own that foundation layer as well as large businesses. So we're saying, look, we've got tremendous amount of data and information that's proprietary. We're not looking to serve that data up to the foundation models via their APIs. We want to control this.

137.    On the same day, Innodata issued a press release on a Form 8-K filed with the SEC titled, "Innodata Announces Potentially Transformative Deals in Generative AI with Three of the Largest Global Tech Companies and Reports First Quarter 2023 Results." In the release, Defendant Abuhoff stated:

> Over the last couple of weeks, we received verbal confirmation from two of the largest five global technology companies that *we have been selected to provide data engineering for their innovation programs in generative AI, the technology*

42

*behind Chat GPT*. One of these companies is an existing customer and the other one will be a new customer. In addition, a third company, also a new customer and another of the largest five global technology companies, has indicated that they are likely to choose us, and we have just reached agreement with them on terms of a master services agreement. We believe these accomplishments are potentially transformative for Innodata.

138. The italicized statements referenced above in ¶¶135, 136, 137 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶¶84, 103. Innodata did not have AI technology and did not have the necessary resources or capabilities to develop AI.

139. During an earnings call on August 10, 2023, Defendant Abuhoff told an analyst that "work that we've done in the past" included "*creating high-quality data and building AI models* and building and integrating them in the wild" and "[w]e're continuing to build still additional real-world experience in terms of *integrating classical and generative AI into operations and products.* And all of these are proving to create significant competitive advantage for us in the market."

140. The italicized statements referenced above in ¶139 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata did not have the resources to "build[] AI models" but was instead continuing to rely on offshore labor.

141. In an earnings call on November 2, 2023, Defendant Abuhoff stated:

Looked at year-over-year, we see the same thing. We returned $4.4 million of adjusted EBITDA growth on $3.7 million of revenue growth. *Third quarter growth was driven by the start of ramp-up for generative AI development work with one of the new big tech customers we announced this summer.* We expect our work with this customer to continue ramping up in the fourth quarter and into the first quarter, potentially reaching a $23 million to $25 million run rate at the end of the year with which to start next year*. At the very end of the quarter, we also kicked off our generative AI development program with the other new big tech customer we announced this summer, and we expect it will also contribute to fourth quarter revenue.* In fact, we anticipate continuing to expand revenue with both of these new customers through Q4 and in 2024.

43

\* \* \*

*In the third quarter, we closed 3 important enterprise generative AI opportunities with large companies. Their scope ranges from strategy to implementation.* In one of the engagements, we will be helping a leading information company create a strategic roadmap for AI LLM integration for its products and internal operations, and we will be building LLM proofs of concept. In another, we will be helping fine-tune LLMs for 3 customer use cases pertaining to legal services. And the third, we will be creating data sets to train an LLM to support doctor patient interactions.

142.    The italicized statements referenced above in ¶141 were materially misleading and omitted to disclose material facts when made for the reasons explained in ¶84. Innodata was not winning sustainable AI-based revenue but was instead being contracted to outsource the one-time job of structuring and tagging data.

## THE TRUTH EMERGES

### A. The Wolfpack Report Reveals Innodata's "AI Washing"

143.    On February 15, 2024, the Wolfpack Report revealed that Innodata misrepresented the nature and extent of its business and operations as an AI. Rather than "delivering the promise of AI," Innodata was actually still dependent on its deteriorating, manual data-entry business driven by offshore labor, not innovation.

144.    The Wolfpack Report also contained statements from former employees of Innodata, including one former high-level employee which called Innodata's AI "smoke and mirrors" and another that claimed Innodata's management was "putting lipstick on a pig" concerning the Company's AI claims. Another former high-level employee explained that rather than providing expertise in AI, Innodata maintained its large offshore labor force that specializes in basic data annotation and were "banging away on keyboards."

145.    The Wolfpack Report also detailed an interview with a former employee about Innodata's future AI initiatives. In response to a question about whether Innodata was going to use AI to any significant degree for new Silicon Valley contracts in 2024, the former employee

44

responded, "All they do is services" and clarified that those services would not include AI, but rather, "services meaning labeling, tagging, computer vision, data aggregation, as far as taking unstructured to structured." In response to a follow-up question from Wolfpack, "so that's not AI?" the former employee responded, "Nope."

146.    Another former employee cited in the Wolfpack Report stated that software giants were not coming to Innodata to "deliver the promise of AI." Rather, those companies "don't need Innodata to help them with AI. They're trillion-dollar market cap companies and they really have to come to Innodata for their AI expertise? It doesn't- you know- it doesn't add up."

147.    On this news, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

**B.  Innodata Delayed Disclosure of SEC and DOJ Investigations "Related to the Conduct Alleged" in this Action**

148.    On March 25, 2024, Innodata received a letter from the SEC's Division of Enforcement. The Company later received a subpoena from the SEC on September 23, 2024. On August 7, 2024, Innodata was subpoenaed by a grand jury in a Department of Justice ("DOJ") investigation.

149.    Innodata waited more than seven months to disclose both the SEC and DOJ investigations and eventually buried the information in the Company's Form 10-Q for the third quarter of 2024, filed with the SEC on November 7, 2024.

150.    In that Form 10-Q, Innodata disclosed in pertinent part:

Subsequently [to the filing of this action], on March 25, 2024, the Company received a letter from the staff of the Securities and Exchange Commission, Division of Enforcement (the "SEC"), requesting the Company preserve certain documents and data; on August 7, 2024 the Company received a grand jury subpoena from the U.S. Department of Justice ("DOJ") requesting the Company to

45

produce certain documents; and on September 23, 2024 the Company received a subpoena from the SEC requesting certain information. The Company believes that the SEC and DOJ requests are related to the conduct alleged in the Securities Class Action, and is cooperating with these investigations. The Company is unable to predict when these matters will be resolved or what further action, if any, the SEC or DOJ may take in connection with it.

151.    Defendants did not discuss the SEC and DOJ investigations in the Company's associated quarterly press release or in the corresponding earnings call. The subpoena was received on August 7, 2024, the day before Innodata released its second-quarter earnings for 2024, at which time Innodata declined to disclose the investigation. The involvement of the DOJ suggests potentially criminal conduct that goes beyond the existing allegations of fraud against Innodata, and the delayed disclosure is further indication of Defendants' scienter.

## ADDITIONAL SCIENTER ALLEGATIONS

152.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Innodata's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Innodata, their control over, and/or receipt or modification of, Innodata's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Innodata, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved the centerpiece of Innodata's reported business, its AI technology and development.

46

153.    Innodata's executives, officers, and directors have also sold approximately $16 million in stock since 2020, with $13 million of those sales in the nine months preceding the filing of this case. Many of these sales occurred soon after promotional press releases touting the Company's AI. For example, on August 29, 2023, following an announcement that Innodata potentially expected to add $10 million in annualized revenue following a partnership expansion, Defendant Abuhoff and Nick Toor, the Chairman of the Board, sold approximately $3.2 million in stock that same day. Certain of Innodata's officers and directors also dumped their stock after favorable press releases on May 11, 2023, June 13, 2023, and July 18, 2023. Defendant Espineli sold approximately $400,000 in stock on those occasions.

154.    On May 11, 2023, Innodata issued a press release titled, "Innodata Announces Potentially Transformative Deals in Generative AI with Three of the Largest Global Tech Companies and Reports First Quarter 2023 Results." In the days following that announcement, Defendant Espineli and other top executives at Innodata sold stock as follows:

| Date | Insider Name | Position | Price | Shares | Proceeds |
|------|--------------|----------|-------|--------|----------|
| 5/16/2023 | Nick Toor | Chairman | $9.01 | (26,500) | $238,765 |
| 5/16/2023 | Stewart Massey | Lead Director | $8.65 | (70,000) | $605,500 |
| 5/17/2023 | Louise Forlenza | Director | $8.26 | (15,000) | $123,900 |
| 5/18/2023 | Nick Toor | Chairman | $9.94 | (54,249) | $538,990 |
| 5/18/2023 | Marissa Espineli | Interim CFO | $9.91 | (3,000) | $29,730 |
| 5/22/2023 | Nick Toor | Chairman | $10.01 | (45,751) | $457,968 |
| 5/22/2023 | Marissa Espineli | Interim CFO | $10.00 | (5,000) | $50,000 |
| 5/30/2023 | Nick Toor | Chairman | $11.60 | (59,010) | $684,516 |
| 5/30/2023 | Ashok Mishra | EVP and COO | $11.26 | (141,859) | $1,597,332 |

155. On June 13, 2023, a press release was issued titled, "Innodata Announces Start of Generative AI Development with Top-Five Big-Tech Existing Customer." Following that announcement, directors at Innodata sold stock as follows:

| Date | Insider Name | Position | Price | Shares | Proceeds |
|---|---|---|---|---|---|
| 6/14/2023 | Nick Toor | Chairman | $12.26 | (81,564) | $1,000,329 |
| 6/20/2023 | Stewart Massey | Lead Director | $12.26 | (1,000) | $12,260 |
| 6/20/2023 | Nick Toor | Chairman | $12.33 | (41,278) | $508,958 |

156. Another press release titled "Agreement Signed with Big Five Tech Customer" was issued on August 22, 2023 and stated that "with the signing of this agreement, Innodata is now engaged to support four of the Big Five technology companies in their generative AI development initiatives." Following this announcement, top executives and directors sold stock as follows:

| Date | Insider Name | Position | Price | Shares | Proceeds |
|---|---|---|---|---|---|
| 8/23/2023 | Nick Toor | Chairman | $13.56 | (217,428) | $3,949,074 |
| 8/28/2023 | Marissa Espineli | Interim CFO | $15.07 | (8,372) | $126,197 |
| 8/23/2023 | Louise Forlenza | Director | $13.74 | (5,000) | $68,700 |

157. On August 29, 2023, news that "Innodata Lands Significant LLM Expansion with New 'Big Five' Customer Announced July 18, 2023" was issued to the public. Following this announcement, top executives and directors sold stock as follows:

| Date | Insider Name | Position | Price | Shares | Proceeds |
|---|---|---|---|---|---|
| 8/29/2023 | Jack Abuhoff | CEO | $14.54 | (150,000) | $2,180,724 |
| 8/29/2023 | Nick Toor | Chairman | $14.77 | (67,804) | $1,001,465 |

| 8/30/2023 | Marissa Espineli | Interim CFO | $15.04 | (11,628) | $174,885 |
| 8/30/2023 | Nick Toor | Chairman | $14.77 | (23,383) | $345,367 |

158.    The suspicious timing of these stock sales by Defendants Abuhoff and Espineli further demonstrates their consciousness of wrongdoing.

159.    As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

160.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Innodata common stock and operated as a fraud or deceit on purchasers of Innodata common stock. When the truth about Defendants' misconduct was revealed, the value of Innodata common stock declined significantly as the prior artificial inflation was removed from the stock price.

161.    As discussed above, investors learned the truth when the Wolfpack Report revealed on February 15, 2024 that Innodata misrepresented the nature and extent of its business and operations, and that its purported AI was "smoke and mirrors." As a result of this disclosure, the price of Innodata common stock declined by $3.74 per share, or approximately 30.5%, from $12.26 per share on February 14, 2024 to close at $8.52 on February 15, 2024.

162.    The decline in the price of Innodata common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the losses suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to the Defendants' fraudulent conduct.

49

163.    The economic loss, i.e., damages suffered by Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Innodata common stock and the subsequent significant decline in the value of Innodata common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

164.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and other Class members. Those statements were materially false and misleading due to their failure to disclose a true and accurate picture of Innodata's business, operations, and financial condition, as alleged herein. Throughout the Class Period, the Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Innodata common stock to be artificially inflated at all relevant times. Lead Plaintiff and other Class members purchased Innodata common stock at those artificially inflated prices, causing them to suffer the damages detailed herein when the truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

165.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)    The omissions and misrepresentations were material;

c)    The Company's common stock traded in efficient markets;

d)    The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e)  Lead Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

166.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others:

a)  Innodata's common stock trades on the Nasdaq;

b)  According to Innodata's 2023 Form 10-K filed with the SEC on March 4, 2024, there were more than 28,131 shares of Innodata common stock outstanding as of December 31, 2023, representing a very broad and active trading market;

c)  Innodata filed public reports with the SEC;

d)  Innodata regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services;

e)  Innodata was followed by securities analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

f)  Unexpected material news about Innodata was rapidly reflected in and incorporated into Innodata common stock prices during the Class Period. Lead Plaintiff and the

51

Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

167. Because Innodata is a publicly traded company, Defendants knew, understood, and had reason to expect that: (1) their misstatements would artificially inflate the price of Innodata common stock; (2) investors would rely on the price of Innodata common stock as reflecting accurate information known to Innodata and its executives; and (3) their misstatements and omissions would induce Lead Plaintiff and other Class members to purchase Innodata common stock during the Class Period.

168. As a result of the foregoing, the market for Innodata common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Innodata common stock. Under these circumstances, all purchasers of Innodata common stock during the Class Period suffered similar injury through their purchase of Innodata common stock at artificially inflated prices, and a presumption of reliance applies.

169. Further, Lead Plaintiff's and other Class members' reliance will be proven class-wide through common, circumstantial evidence that Lead Plaintiff would not have purchased Innodata common stock but for Defendants' uniform misrepresentations and omissions about Innodata's AI capabilities.

170. Lead Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Lead Plaintiff is entitled to a presumption of reliance throughout the Class Period because Defendants misrepresented and failed to disclose material information regarding Innodata's AI capabilities.

**NO SAFE HARBOR**

171.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many statements herein were not identified as "forward-looking" when made. Alternatively, to the extent that there were any forward-looking statements, no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. If the statutory safe harbor indeed applies to any forward-looking statements pleaded herein, Defendants are liable because at the time each forward-looking statement was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**CLASS ACTION ALLEGATIONS**

172.    Lead Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Innodata common stock between May 9, 2019 through February 14, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

173.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

174.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

   a) Whether Defendants violated the Exchange Act;

   b) Whether Defendants omitted and/or misrepresented material facts;

   c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

   e) Whether the price of the Company's stock was artificially inflated; and

   f) The extent of damage sustained by Class members and the appropriate measure of damages.

175.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

176.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

177.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

178.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54

179.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

181.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants)

182.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

183.    Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiff to be false or misleading both prior to and

55

immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable under §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest.

C.      Awarding Lead Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D.      Awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

DATED: March 27, 2025                    Respectfully submitted,

                                         /s/ Kevin G. Cooper
                                         James E. Cecchi
                                         Donald A. Ecklund

56

Kevin G. Cooper
**CARELLA BYRNE CECCHI
BRODY & AGNELLO,  P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700
JCecchi@carellabyrne.com
DEcklund@carellabyrne.com
KCooper@carellabyrne.com

*Local Counsel for Lead Plaintiff Grondin and the Class*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com

*Lead Counsel for Lead Plaintiff Grondin and the Class*