<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DAVID D'AGOSTINO, individually and on behalf of all others similarly situated,<br><br>       *Plaintiff,*<br><br>       v.<br><br>INNODATA INC., JACK ABUHOFF, MARK SPELKER, and MARISSA ESPINELI,<br><br>       *Defendant.* | Civil Action No. 24-971<br><br>**OPINION**<br><br>April 27, 2026 |

**SEMPER**, District Judge.

**THIS MATTER** comes before the Court on Defendants Innodata, Inc., Jack Abuhoff, and Marissa Espineli's (collectively, the "Innodata Defendants") and Defendant Mark Spelker's respective Motions to Dismiss Lead Plaintiff Francis Grondin's Second Amended Complaint. (ECF 49, "Innodata's Motion to Dismiss" or "Innodata Mot."; ECF 50, "Spelker's Motion to Dismiss" or "Spelker MTD"; ECF 48, "Second Amended Complaint" or "SAC.") Plaintiff opposed both Motions (ECF 51, "Opposition to Innodata's MTD" or "Opp. to Innodata"; ECF 52, "Opposition to Spelker's MTD" or "Opp. to Spelker"), and Defendants respectively replied in support of their Motions. (ECF 53, "Spelker's Reply ISO MTD" or "Spelker Reply"; ECF 54, "Innodata's Reply ISO MTD" or "Innodata Reply.") The Court has decided the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants Innodata, Abuhoff, and Espineli's Motion is **GRANTED** and Defendant Spelker's Motion is **GRANTED**.

1

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Lead Plaintiff Francis Grondin ("Plaintiff") is an individual investor who purchased shares of Defendant Innodata Inc.'s common stock.  (SAC ¶ 20.)  Plaintiff brings this putative class action on behalf of all those who purchased or otherwise acquired Innodata common stock during the period from May 9, 2019 through February 14, 2024 (the "Class Period").  (*Id.* ¶ 1.)

Defendant Innodata is a data engineering company headquartered in Ridgefield Park, New Jersey.  (*Id.* ¶ 21.)  Defendant Jack Abuhoff is the co-founder and Chief Executive Officer of Innodata.  (*Id.* ¶ 22.)  Defendant Marisa Espineli is the Interim Chief Financial Officer of Innodata, a role she has held since March 2022.  (*Id.* ¶ 24.)  Defendant Mark Spelker formerly served as Innodata's Chief Financial Officer from October 2020 until he resigned in March 2022.  (*Id.* ¶ 23.)  Defendant Spelker served in this role in a part-time capacity.  (*Id.* ¶ 77.)

Plaintiff alleges that, during the Class Period, Defendants defrauded investors by making materially false and misleading statements and omissions about Innodata's artificial intelligence capabilities in their SEC disclosures and earnings calls, a practice Plaintiff refers to as "AI washing."  (*Id.* ¶¶ 4-7.)  Specifically, Plaintiff alleges that during a May 9, 2019 earnings call, Defendant Abuhoff stated:

> "The key enabler to [Innodata's] repositioning will be certain AI technologies that we developed and validated internally for the past 2 years. […]  That having been accomplished, we now believe we can turn our AI focus externally, building these tested technologies into market-facing services and product offerings, designed around helping enterprises integrate AI into events, document and content transformation, which in turn are expected to increase revenues and drive growth for us."

(*Id.* ¶ 83.)  Plaintiff further alleges that, during the same earnings call, Defendant Abuhoff said:

---

[1] The facts and procedural history are drawn from the Second Amended Complaint.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  For the purposes of a motion to dismiss, the facts drawn from the complaint are accepted as true.  *See Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

"What we're able to do with our AI is we are able to make that process much less people intensive. […] There's data that computers can't read real well, and we've trained AI models to be able to dramatically reduce the human intervention required to make those machine readable. And we have the capabilities now and we're learning to know how to mix AI with human expertise to achieve a very efficient and very high-quality result."

(*Id.* ¶ 85.)

Plaintiff alleges that during another earnings call on August 8, 2019, Defendant Abuhoff stated:

"So the AI that – we're using AI in all of our businesses. […] But for the most of the AI investments that we've made has actually been in our core business, and we used that investment early on in order to drive operational excellence and help us with our cost rationalization and turnaround of that business last year. Now what we're doing is we're building that into market-facing products that will help us expand our addressable market."

(*Id.* ¶ 87.)

Plaintiff alleges that on another earnings call on November 7, 2019, Defendant Abuhoff stated:

"And over the past couple of years, we've been harnessing AI and machine learning capabilities. […] For the last 2 years, we've been on a path of transforming our business in order to become a leader in these fast-growing markets. This journey began with us creating AI-based solutions for our own internal use, and our success here enabled us to remove several million dollars of costs of manual human labor, management and infrastructure, while at the same time, improving the quality of our offerings. Our success with developing these AI capabilities has now enabled us to package them as solutions that we can take to a wider range of industries and applications. […] By way of example, we are on track to close this year over $1 million of opportunities for the new services listed on our website with companies that are outside our traditional publishing sector."

(*Id.* ¶ 90.) Plaintiff further alleges that during the same earnings call, in response to an analyst's question about the company's skill set and expertise in AI, Defendant Abuhoff stated:

"So there are people who are building AI models, they need to train those models. And what they need is a combination of AI, human expertise and a secure data infrastructure in which to do that. We bring all that to the table. […] And when we're performing data transformation, data curation for people, we're using the AI models that we've built, oftentimes working with the frameworks that are produced by some of the very large companies. But they are models that we've built and that

3

> we've engineered, we maintain and we manage, that turn documents that people now read into data that computers can read.  We're helping to curate data, master data that's at the core of companies' success, like CRM data, that again works with the combination of our trained experts and our robust trained AI models."

(*Id.* ¶ 92.)

Plaintiff alleges that during a conference call on March 12, 2020, Defendant Abuhoff responded to an analysts question about the company's expansion in AI by stating, "We're working with the leading information providers, applying AI to continent operations on their behalf. And we're receiving very good market recognition in those markets for having done that."  (*Id.* ¶ 94.)

Plaintiff also alleges that during a conference call on May 14, 2020, Defendant Abuhoff stated, "Last year, as you recall, we pivoted the company from a publishing services provider to a data engineering company, rolling out new products and solutions to help companies in wider markets, prepare data for AI and put AI to work in their businesses."  (*Id.* ¶ 96.)  Plaintiff alleges that on the same call, Defendant Abuhoff further stated that "[w]ith our AI, focus, our pipeline soon grew to include banks, hedge funds, online trading platforms and financial services firms as well as drug companies, drone companies, software companies and even movie studios."  (*Id.*)

Plaintiff alleges that on another conference call on August 6, 2020, Defendant Abuhoff stated:

> "We only started marketing and selling AI data prep and annotation services in Q4 of last year.  Nevertheless, to date, we have closed 15 new customers.  We have another 16 customers in late-stage pipeline that are expected to close in the second half.  We are forecasting a total of $3.5 billion in bookings -- excuse me, $3.5 million of bookings from this market this year, and we're expecting that a majority of these deals will produce recurring managed services revenue at our target margins.  […]  It is worth mentioning that one of our recent data annotation wins is with a prominent big tech company.  To secure this work, we beat out 7 incumbents, winning the business based on our quality and our capabilities."

(*Id.* ¶ 98.)

4

Plaintiff alleges that during an earnings call on November 12, 2020, Defendant Abuhoff stated:

"In our core digital solutions business, we are now primarily focused on the AI data preparation market that was estimated $1.9 billion this year and is expected to grow to $3.2 billion by 2023. […]  As a result, we're winning deals in the AI data preparation market against several incumbent providers.  We launched our AI data preparation offering late in Q4 last year.  And to date, we have closed 18 new customers, and we have another 20-or-so in our late-stage pipeline. […]  In just 5 months, we've become one of this company's preferred vendors, and we're now running multiple projects across 7 languages.  Our scope includes AI-based search classification to improve the search experience, sentiment analysis to automate content filtering, product classification engines to improve product placement for advertising, trend representation to identify trending topics on the platform, toxicity identification algorithms to identify content that violates terms of service and misinformation identification to auto identify fake and misleading information."

(*Id.* ¶ 100.)

Plaintiff alleges that during an earnings call on March 11, 2021, Defendant Abuhoff made the following statements about Innodata's Goldengate Platform:

"And it performs a series of cognitive tasks to extract intelligence that people can use for generating inferences and powering analytical applications.  In terms of AI, it is truly state of the art, serving up no-code AI with transfer learn built on generative language models we have developed and perfected over the past 5 years of deploying industrial deep neural networks.  Golden Gate will be the AI under the hood that powers our data annotation platform and brings AI capabilities to our industry platforms like Synodex and Agility.  Golden Gate will also be the foundational technology for work we perform for customers. The main benefits of the platform is that it's no code, so it does''t require a large number of data scientists to build models or require a data science platform to orchestrate models and update models.  Using Golden Gate in combination with our SMEs, we were able to build high-performing cutting-edge models that address real-world problems."

(*Id.* ¶ 102.)  Plaintiff alleges that during the same earnings call, in response to an analyst's question about Innodata's use of AI, Defendant Abuhoff stated:

"So we've built Golden Gate, which is cutting-edge AI. […]  But now we're combining those people with the Golden Gate technology to create cutting edge, high-performing AI models and very high-quality data that can be used to train those models. […] And now instead of delivering back to the market ebooks, we're delivering to them high-quality training data.  We're delivering to them AI solutions, things programmed with data.  And we're delivering AI industry

5

platforms that generalize the AI into platforms that do things for people that they require to be done in order to run their businesses better."

(*Id.* ¶ 104.)

Plaintiff alleges that on March 12, 2021, Innodata filed its SEC Form 10-K for the previous fiscal year, in which Defendants stated:

> "Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack. […] It serves up no-code AI with transfer learning built on generative language models we have developed over the past five years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms."

(*Id.* ¶ 106.)

Plaintiff also alleges that during a conference call on May 6, 2021, Defendant Abuhoff stated of Innodata's AI capabilities:

> "So I think as you know, we started building and working with AI about 5 years ago. We did a lot of work internally with it, and we built some high-performing systems that are working very, very well for us. We turn those systems into external market-facing capabilities, and we started to bring those to market last year, and we're continuing that this year. And we're finding that our combination of very high-performing AI stack that has been trained through lots of content development work that we've done, in combination with our global reach in terms of subject matter expertise and humans in the loop that can work with our technology to create high-performing training data for our customers and create very compelling outcomes in terms of applied AI, is really the perfect combination to be competing in the world."

(*Id.* ¶ 108.)

Plaintiff further alleges that, during an earnings call on August 5, 2021, Defendant Abuhoff stated, "The AI initiatives we're working on fall basically into 2 categories. First category are AI implementations that help organizations modernize or streamline processes. The second category are AI implementations that deliver fundamentally new experiences." (*Id.* ¶ 110.)

Plaintiff also alleges that during an earnings call on November 4, 2021, Defendant Abuhoff stated:

> "First, we've created an AI platform that we've trained with a lot of data. […]  So we've trained our algorithms to perform very, very well.  We're building those algorithms. We're embedding them into many of our platforms, all of our new platforms for sure.  We're deploying those as accelerators for many of our existing clients, enabling to get better results and more accurate results."

(*Id.* ¶ 112.)

Plaintiff alleges that during an earnings call on March 17, 2022, Defendant Abuhoff stated:

> "One of the largest Fortune 50 semiconductor manufacturers selected us to build fully-trained deep-learning AI models for automated retail and manufacturing solutions.  This is an example of end-to-end AI services from synthetic data creation to model training and model management. […]  In addition, our plan calls for us to develop additional SaaS platform products that encapsulate our proprietary AI in order to reimagine legacy, slow and inefficient knowledge-based processes."

(*Id.* ¶ 114.)  On the same earnings call, Defendant Abuhoff stated that Innodata had "full-service AI capabilities[,]" and that Innodata was "able to show [customers] our platforms" and "start them out with high performance because of the way we built our AI technologies."  (*Id.* ¶ 115.)

Plaintiff alleges that in its March 24, 2022 SEC Form 10-K filing for the previous fiscal year, Defendants stated:

> "Our platforms and services are powered by Goldengate, our proprietary AI/ML platform, as well as other technologies we have developed. […]  Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack. […]  It serves up no-code AI with transfer learning built on generative language models we have developed over the past six years of deploying industrial deep neural networks. Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms. […]  In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we intend to commercialize it further as both a customer-facing technology and as the engine under other potential industry solutions."

(*Id.* ¶ 117.)

Plaintiff alleges that during an earnings call on May 12, 2022, Defendant Abuhoff stated, "We launched our AI-enabled document intelligence platform in late March as planned.  This new

customer-facing platform uses our proprietary Goldengate AI technology to automatically extract meaning from complex documents." (*Id.* ¶ 119.)

Plaintiff alleges that during an earnings call on August 11, 2022, Defendant Abuhoff stated:

> "We also have made investments in commercializing our proprietary Goldengate AI technology stack in the form of an AI data annotation platform, an AI document intelligence platform and industry solutions that utilize our AI to enable customers to do deeper analytics and textual data and documents with fewer people. […] This new customer-facing platform uses our Goldengate AI technology to automatically extract meaning from complex documents. It can be utilized across domains, from health care to financial services to media and entertainment, essentially any business that employs people to read or manage complex documents."

(*Id.* ¶ 121.)

Plaintiff alleges that during an earnings call on November 10, 2022, Defendant Abuhoff stated:

> "Outside these transitory issues, we believe our business continues to build momentum. We now have 10 large customers for our AI ML life cycle services, which we believe will increase their spend with us in 2023, some significantly based on our current line of sight. […] The use cases we're landing include facial recognition, retail anomaly detection, automation, chatbots, security monitoring and voice-to-text."

(*Id.* ¶ 123.) During the same earnings call, in response to an analyst's question about developing language models, Plaintiff alleges that Defendant Abuhoff stated, "First of all, we developed a high-performing language model for this customer to enable them to integrate it into their operations to begin to automate certain tasks that are tests that are important to them." (*Id.* ¶ 125.) Plaintiff furthers alleges that, in response to a follow-up question about the consistency of Innodata's revenue from AI business, Defendant Abuhoff stated:

> "So there'll be recurring revenue in terms of the ongoing management and optimization of the ML, There'll be one-time revenue in terms of cloud migration. But we think that there'll be recurring customer revenue in terms of migrations because we do believe that that will continue for a while. And then pure recurring revenue from MO models because there's always the need to be retraining and reoptimizing the models to comport with heterogeneous data that's coming into the company."

(*Id.* ¶ 126.)

Plaintiff also alleges that in its February 23, 2023 SEC Form 10-K filing for the previous fiscal year, Defendants stated:

> "We develop custom AI models (where we select the appropriate algorithms, tune hyperparameters, train and validate the models, and update the models as required) [and] in addition to deploying and integrating AI models, we often provide a range of data engineering support services including data transformation, data curation, data hygiene, data consolidation, data extraction, data compliance, and master data management. […] Our proprietary, state-of-the-art Goldengate platform is our core AI technology stack. […] It serves up low-code AI with transfer learning, orchestrating generative LLMs we have developed over the past seven years of deploying industrial deep neural networks as well as third-party foundation models. […] Goldengate serves as the foundational technology for the AI projects we perform for customers, as well as the AI-under-the-hood that powers our data annotation platform and our industry platforms. […] In 2021 we further AI-enabled Synodex, Agility and our data annotation platform using Goldengate; in 2022, we commercialized it further as both a customer-facing technology and as the engine under other potential industry solutions. […] Our Innodata Labs researches and develops AI-based technologies that we utilize in our operations and with our customers. […] Approximately seven years ago, we formed Innodata Labs, a research and development center, to research, develop and apply machine learning and emerging AI to our large-scale, human-intensive data operations. […] Our historical core competency in high-quality data, combined with these R&D efforts in applied AI, created the foundation for the evolution of our offerings, which include AI Data Preparation, AI Model Deployment and Integration, and AI-Enabled Industry Platforms."

(*Id.* ¶¶ 128-129, 131.)

Plaintiff further alleges that during an earnings call on February 23, 2023, Defendant Abuhoff stated:

> "Our proprietary AI engine, Goldengate, uses the same underlying encoder-decoder transformer neural network architecture as GPT. […] We believe our third opportunity is to harness GPT and other large language models in our own AI industry platforms. Just last month, we announced PR CoPilot, a new module within our Agility PR platform that combines proprietary Innodata technology and GPT to enable communications professionals to generate first draft of press releases and media outreach in record time."

(*Id.* ¶ 133.)

9

Plaintiff alleges that during a May 11, 2023 conference call Defendant Abuhoff stated:

> "[O]ver the past several years, we have been integrating both generative and classical AI into real-world customer operations, workflows and platforms.  […]  We built the PR CoPilot, the generative AI model that we launched within the platform in January.  […]  We've got great strong customer reception, a super cool road map for successive releases around that this year."

(*Id.* ¶ 135.)  Plaintiff also alleges that during the same conference call, Defendant Abuhoff responded to a question about the difference between Innodata's annotation services and outsourced manual annotation services by stating:

> "Yes, there is. There's a great deal of difference. Some of the early models that have been built kind of go very broad, but very narrow. There's not a great deal of annotation that's required. Much of what we do is the complex stuff. It's going deep into subject-matter domains. It's going deep into use cases."

(*Id.* ¶ 136.)

Plaintiff alleges that on February 23, 2023, Defendants issued a press release titled "Innodata Announces Potentially Transformative Deals in Generative AI with Three of the Largest Global Tech Companies and Reports First Quarter 2023 Results" in which Defendant Abuhoff stated, "Over the last couple of weeks, we received verbal confirmation from two of the largest five global technology companies that we have been selected to provide data engineering for their innovation programs in generative AI, the technology behind Chat GPT."  (*Id.* ¶ 137.)

Plaintiff alleges that during an August 10, 2023 earnings call, Defendant Abuhoff stated that Innodata had previously worked on "high-quality data and building AI models" and that they were currently "integrating classical and generative AI into operations and products."  (*Id.* ¶ 139.)

Plaintiff also alleges that during a November 2, 2023 earnings call, Defendant Abuhoff stated:

> "Third quarter growth was driven by the start of ramp-up for generative AI development work with one of the new big tech customers we announced this summer.  […]  At the very end of the quarter, we also kicked off our generative AI

development program with the other new big tech customer we announced this summer, and we expect it will also contribute to fourth quarter revenue. […]  In the third quarter, we closed 3 important enterprise generative AI opportunities with large companies.  Their scope ranges from strategy to implementation."

(*Id.* ¶ 141.)

Plaintiff contends that all of these statements were "materially misleading and omitted to disclose material facts when made" because, according to three unnamed former employees of Innodata, Innodata's product "was not enabled by AI or machine learning[,]" the company exaggerated its capabilities using "marketing spin[,]" and the company's business was "powered by humans" performing manual data entry tasks.  (*Id.* ¶ 84.)  In other words, Plaintiff alleges that "Innodata did not have the necessary resources or capabilities to develop AI.  Instead, clients were contracting with Innodata to outsource the labor-intensive, often one-time job of structuring and tagging previously unstructured data to train LLMs."  (*Id.*)  The first former employee ("FE 1") "was a director of business development at Innodata from October 2019 to January 2020[;]" the second ("FE 2") "was an account executive at Innodata's Digital Data Solutions business from May 2017 to September 2020[;]" and the third ("FE 3") "was a senior mid-market business development representative at Innodata from October 2021 to October 2022."  (*Id.* ¶¶ 28-30.)  Plaintiff additionally attributes the falsity of many of the statements to the alleged facts that "Innodata Labs, which had developed a unique AI technology, did not have the necessary resources to develop AI and the Company had not increased spending on research and development[,]" and that the AI team at the company "only consisted of eight employees, and that at least four of those employees have since left the Company."  (*Id.* ¶ 103.)

On February 15, 2024, financial research firm Wolfpack Research released a report (the "Wolfpack Report") that criticized and rebutted many of the statements Innodata had made about its AI capabilities and included interviews with former employees of Innodata who stated that the

company had made misrepresentations about its AI. (*Id.* ¶¶ 143-146.) Plaintiff alleges that due to the revelations in the Wolfpack Report, Innodata's common stock price declined from $12.26 per share on February 14, 2024 to $8.52 on February 15, 2024, a drop of about 31%. (*Id.* ¶ 147.)

Plaintiff alleges that the Wolfpack Report and subsequent dip in stock price precipitated federal regulatory and law enforcement agencies to open investigations into Innodata's business practices. Specifically, Plaintiff alleges Innodata received a letter from the SEC's Division of Enforcement on March 25, 2024, followed by a grand jury subpoena from the Department of Justice on August 7, 2024, and another subpoena from the SEC on September 23, 2024. (*Id.* ¶ 148.) Plaintiff accuses Defendants of "burying" disclosure of these investigative actions in the company's Form 10-Q for the third quarter of 2024, wherein the company stated that it believed these subpoenas "related to the conduct alleged in [the instant action]" and that the company was cooperating with the investigations. (*Id.* ¶¶ 149-150.)

Regarding scienter, Plaintiff alleges that:

"Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Innodata's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Innodata, their control over, and/or receipt or modification of, Innodata's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Innodata, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved the centerpiece of Innodata's reported business, its AI technology and development."

(*Id.* ¶ 152.) Plaintiff further alleges that scienter can be implied by reference to a set of stock sales that key Innodata insiders including Defendants Abuhoff and Espineli made between May 11, 2023 and August 29, 2023 following press releases from the company touting its AI capabilities. (*Id.* ¶¶

12

153-157.)   Plaintiff alleges that "[t]he suspicious timing of these stock sales by Defendants Abuhoff and Espineli further demonstrates their consciousness of wrongdoing."  (*Id.* ¶ 158.)

Regarding loss causation, Plaintiff alleges that the approximately 31% dip in Innodata's stock price attributable to the release of the Wolfpack Report "was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Innodata common stock."  (*Id.* ¶ 163.)  More specifically, Plaintiff alleges that "[t]hroughout the Class Period, the Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Innodata common stock to be artificially inflated at all relevant times."  (*Id.* ¶ 164.)

Plaintiff asserts that he is "entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose."  (*Id.* ¶ 170.)  Plaintiff also contends that "[t]he statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged" because Plaintiff alleges that none of the statements at issue were forward-looking and, to the extent that any statements were forward-looking, "no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements."  (*Id.* ¶ 171.)  Plaintiff brings these claims on behalf of "a class of all persons and entities who purchased or otherwise acquired Innodata common stock between May 9, 2019 through February 14, 2024, inclusive."  (*Id.* ¶ 172.)

In Count I of the SAC, Plaintiff accuses all Defendants of violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  (*Id.* ¶¶ 178-181.)  In Count II, Plaintiff charges the Individual Defendants (Defendants Abuhoff, Espineli, and Spelker) with violating

Section 20(a) of the Exchange Act.  (*Id.* ¶¶ 182-183.)  As relief, Plaintiff seeks: an order granting certification of the Class under Rule 23 of the Federal Rules of Civil Procedure; an award of compensatory and punitive damages for damages flowing from the alleged fraud, including pre- and post-judgment interest; Lead Plaintiff's litigation costs and attorneys' fees; and any other relief the Court may deem appropriate.  (*Id.* at 56.)

On February 21, 2024, Plaintiff filed the original Complaint in this action.  (ECF 1, "Complaint" or "Compl.")  On October 30, 2024, the Court granted Plaintiff's motion to appoint Francis Grondin as Lead Plaintiff.  (ECF 33.)  On January 6, 2025, Plaintiff filed the First Amended Complaint (ECF 38, "FAC") pursuant to a stipulation between the parties and this Court's order (ECF 37).  Defendants moved to dismiss the FAC (ECF 41; ECF 42), and Plaintiff submitted an unopposed motion for leave to file a Second Amended Complaint (ECF 46).  On April 8, 2025, the Court granted that motion (ECF 47), and on April 10, 2025, Plaintiff filed the SAC, which is the operative complaint in this case.  On April 11, 2025, Defendants Abuhoff, Espineli, and Innodata moved to dismiss the SAC (Innodata MTD), and on April 14, 2025, Defendant Spelker did the same (Spelker MTD.)  On April 21, 2025, Plaintiff opposed both motions to dismiss (Opp. to Innodata; Opp. to Spelker.)  On May 21, 2025, all Defendants filed replies in support of their motions to dismiss.  (Innodata Reply; Spelker Reply.)  On June 24, 2025, the Innodata Defendants submitted documents notifying the Court that the SEC and DOJ had each closed their respective investigations of Innodata without taking enforcement actions.  (ECF 55; ECF 56.)  On July 1, 2025, Plaintiff submitted a letter responding to the Innodata Defendants' notice.  (ECF 57.)

## II.    LEGAL STANDARD

### a.  Rule 12(b)(6)

14

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted[.]"  For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id.* at 789.

### b.  Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements for claims of fraud.  "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).  Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of

substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### c.   Private Securities Litigation Reform Act Pleading Requirements

"To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 639 (D.N.J. 2021) (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)). "To state a claim under the Securities Exchange Act § 20(a), imposing liability on control persons under the Act, plaintiffs must allege (1) a primary violation; (2) scienter; and (3) control of a primary violator." *Poling v. K. Hovnanian Enters.*, 99 F. Supp. 2d 502, 514 (D.N.J. 2000)

For plaintiffs asserting securities fraud claims, the PSLRA imposes additional pleading requirements. "The PSLRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). The PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* at 241-42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal quotations omitted). In other words, plaintiffs bringing a claim involving an allegedly false or misleading statement must

"(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Rahman*, 736 F.3d at 242 (quoting *Tellabs*, 551 U.S. at 321).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing Federal Rule of Civil Procedure 9(b)'s requirements. *Id.* at 241 n.3. Although the "PSLRA replaced Fed. R. Civ. P. 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA. *Id.* This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Section 78u-4(b)(1) also adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information [or] belief," plaintiffs must "state with particularity all facts on which that belief is formed"—that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1).

As to the second element, the PSLRA's approach for pleading scienter sharply deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally. *Avaya*, 564 F.3d at 253. Under the PSLRA, the court must evaluate whether all the facts in the complaint as alleged, taken collectively, give rise to a "strong inference of scienter"—not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates

17

how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.*  Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324.  Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.*  A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III.    ANALYSIS

The Court reviews each Motion in turn, beginning with the Innodata Defendants' Motion to Dismiss.

### a.  Innodata Defendants' Motion

In their Motion, the Innodata Defendants argue that the SAC should be dismiss because it fails to plead actional material misrepresentations or omissions, it fails to plead scienter, it fails to plead loss causation, and accordingly, it fails to plead a Section 20(a) violation.  (Innodata Mot. at 1-6.)

#### i.  False and Misleading Material Misrepresentations and Omissions

The Innodata Defendants first argue that the SAC's allegations amount to "forbidden 'puzzle pleading'" (*id.* at 10), which "refers to a pleading that requires a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *5 (N.D. Cal. Mar. 29, 2013).  In their view, this "alone warrants dismissal," because they argue that "[c]ourts in the Third Circuit and elsewhere routinely dismiss complaints that engage in 'puzzle pleading[,]'" citing *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *3 (D. Del. Sept.

6, 2017) and *In re Stem, Inc*, 2025 WL 359054, at *6 (D. Del. Jan. 31, 2025). (Innodata Mot. at 11.)

Defendants then argue that, despite Plaintiff's allegations that "Defendants' public statements omitted: (a) Innodata's continued reliance on its overseas human workforce; and (b) the limitations of Innodata's financial resources, without which it allegedly cannot do the same work as other AI companies[,]" Defendants "consistently disclosed this information throughout the class period." (*Id.* at 12.) To illustrate this point, Defendants point to statements in some of the earnings calls and SEC disclosure forms that Plaintiff takes issue with, in which Defendants indicated that its overseas human workforce would remain a key component of Innodata's technology and product offerings. (*Id.* at 12-15.) Defendants also point to statements by Abuhoff averring that Innodata lacked the budget and infrastructure to be competitive with larger AI companies. (*Id.* at 15-16.)

Defendants then argue that Plaintiff can only rely on confidential witness statements to support claims of securities fraud where:

> "(1) the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support of a fraud allegation, or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged."

*In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2020 WL 2786936, at *6 (D.N.J. May 29, 2020) ("*Synchronoss II*"). They assert that none of Plaintiff's factual allegations are independently sufficient to state a securities fraud claim, and that Plaintiff does not make a particularized showing that the confidential former employees would have had access to information about Innodata's AI capabilities sufficient to corroborate the alleged falsity and materiality of the statements and omissions in the earnings calls and SEC disclosures. (Innodata Mot. at 17-18.) Specifically, Defendants argue that, to make such a showing, "the [Amended Complaint] must disclose: (1) the

19

time period that the [Former Employee] worked at [Innodata], (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Synchronoss II*, 2020 WL 2786936, at *6.  Defendants note that none of the confidential former employees worked at Innodata for roughly half of the Class Period, including the last fifteen-plus months, and that "12 of the challenged statements were made at a time when none of the Former Employees worked at Innodata[.]"  (Innodata Mot. at 18-19.)  Defendants offer that this evinces "a lack of firsthand knowledge as to the majority of facts[,]" citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) and *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *10 (D.N.J. July 3, 2019).  (*Id.* at 19.)

Defendants also argue that, even for the alleged false statements and omissions that did occur during their tenure, the SAC lacks particularized facts suggesting that the former employees would have had credible information about the state of Innodata's AI.  (*Id.* at 19-22.)  For example, Defendants note that all of the former employees allegedly worked in sales, none of them worked in or with Innodata Labs (the division responsible for the company's AI operations), and the SAC is otherwise thin on details about the former employees' specific knowledge of the Goldengate AI tool and customer contracts.  (*Id.* at 20-21.)

Defendants argue that the SAC "failed to provide the requisite link between" the former employees' statements and the challenged statements, an extension of their "puzzle pleading" argument.  *Synchronoss II*, 2020 WL 2786936, at *8.  They also argue that the court should reject statements from the former employees that amount to opinions and speculation rather than factual allegations, citing *In re Ferro Corp. Sec. Litig.*, 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007), *In re Intelligroup Secs. Litig.*, 527 F. Supp. 2d 262, 360–61 (D.N.J. 2007), and *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 544 (D.N.J. 2010).

Defendants' final argument on this front is that the Wolfpack Report does not support Plaintiff's allegations that the challenged statements were false or misleading.  (Innodata Mot. at 24-30.)  Defendants cite *In re DraftKings Inc. Secs. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) for the proposition that the Court must exercise caution in crediting the allegations of the Wolfpack Report because it was authored by a party interested in driving down Innodata's stock price in pursuit of turning a profit.  (*Id.* at 24.)  They also note that another court in this District adopted a "hard look" approach when faced with allegations stemming from a short seller's report in *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 550 (D.N.J. 2024), and they take issue with the anonymity of the Wolfpack Report's sources, the Report's use of "vague idioms that provide no facts[,]" and the lack of substantiation for the Report's claim about the Innodata's allegedly insufficient spending on AI development.  (*Id.* at 25-30.)

In his Opposition, Plaintiff argues that the SAC sufficiently "identifies who made the alleged misstatements, what they were about, when they were made and where they were made." (Opp. to Innodata at 12.)  Plaintiff rebuts Defendants' argument that the SAC amounts to a "puzzle pleading" by citing *In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 426 (D.N.J. 2002) for the proposition that a puzzle pleading "reflects a 'great web of scattered, vague, and redundant and often irrelevant allegations[,]'" whereas in this case, "the Complaint specifically identifies the facts explaining how and why Defendants' Class Period statements were misleading when made." (*Id.* at 23-24.)  He also argues that the challenged statements cannot be considered puffery because the statements are material and not forward-looking.  (*Id.* at 24-27.)

Plaintiff further argues that Defendants do not posit that "Innodata did in fact develop AI, but [instead they argue] that they disclosed: (1) the existence and significance of Innodata's

21

overseas workforce, and (2) that Innodata's limited resources prevented it from competing with larger AI companies." (*Id.* at 14.)

Disputing Defendants' characterization of the SAC, Plaintiff:

"does not allege that investors were unaware of the existence and number of Innodata's overseas employees or their general importance to the business. Rather, investors were misled into believing that Innodata had developed its own AI, when, in fact, it was instead still reliant on human labor for its so-called AI."

(*Id.*)   Plaintiff likens this case to *Jaeger v. Zillow Grp., Inc.*, in which the court found that defendants "concealed the broader, more complicated, human-driven process…and instead created the misleading impression that Zillow was still advancing its automation efforts."  644 F. Supp. 3d 857, 871 (W.D. Wash. 2022).  Plaintiff also takes issue with Defendants' argument that Plaintiff is wrong to compare Innodata's spending on AI development to companies like Palantir, arguing that this "ignores the fact that Innodata likewise represented itself as an AI innovator and touted 'state-of-the-art' products such as Goldengate and PR Copilot."  (Opp. to Innodata at 17.)

Regarding Defendants' contention that the court should discredit allegations attributable to the former employees, Plaintiff notes that:

"In *City of Warren Police & Fire Sys. v. Prudential Financial*, *Inc.*, 70 F. 4th 668, 691-92 (3rd Cir. 2023) the Third Circuit reaffirmed that confidential former employee's allegations in a securities fraud complaint should not be discounted where the complaint provides the 'confidential witness's basis of knowledge; the level of detail provided by the witness; the degree to which other testimony or evidence corroborates the witness's account; and the internal consistency of the information provided.'"

(*Id.* at 18.)  Plaintiff argues that the SAC provides all information necessary and cites several cases for the proposition that "Courts in this District have routinely rejected the additional requirements

that Defendants seek to impose, including that the combined tenure of confidential witnesses must span the entire class period."[2]  (*Id.* at 18.)

Plaintiff then argues that the Court should credit the Wolfpack Report because "many courts 'have held that a short-seller report ... does not implicate the same skepticism as a 'traditional' anonymous source[,]'" citing *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *9 (D.N.J. Apr. 20, 2021).  (*Id.* at 21.)  Plaintiff also argues that ruling out the Wolfpack Report would be premature at this stage of the litigation "because these issues are 'fundamentally evidentiary in nature[,]'" citing *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 383 (S.D.N.Y. 2024).  (*Id.* at 22-23.)

In their reply brief, the Innodata Defendants argue that "[t]he Opposition excises from the SAC any claim that Innodata exaggerated its AI to claim solely that Innodata had no AI at all[,]" such that "the Opposition pleads the SAC out of Court, as its allegations of exaggerated AI, by necessity, concede the Company nonetheless *had AI*."  (Innodata Reply at 2.)  Regarding the puzzle pleading argument, Defendants assert that Plaintiff's Opposition does not "connect the challenged statements to the 70-plus allegations of falsity."  (*Id.* at 4.)  Defendants then reiterate their argument that "the low-level sales [former employees] are unreliable as to (for example) Innodata Labs' work, R&D spend, Goldengate, and the offshore laborers[,]" citing *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *14 (D. Md. Sept. 28, 2023), *aff'd sub nom., Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025).  (*Id.* at 6.)  Defendants also assert that, rather than "asking this Court to make an 'evidentiary' ruling" on the admissibility of the Wolfpack Report, they "ask the Court to apply the

---

[2] Plaintiff cites *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019); *In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at *7–8 (S.D.N.Y. Jan. 27, 2025); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004); and *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *7 (D.N.J. Sept. 30, 2009)

PSLRA's *pleading standards* as persuasively interpreted by numerous Courts considering anonymous short sellers' financial incentives to embellish and lie—a skepticism that this District already applies to presumably *unbiased* media sources."  (*Id.* at 8-9.)

First, the Court agrees with Plaintiff that the SAC is not an improper puzzle pleading.  Each alleged falsehood or omission is excerpted and identified using bold italic font, and each one is also followed by a paragraph that includes a brief explanation of the reason Plaintiff believes the statement to be actionable.  The SAC thus cannot credibly be construed as a "great web of scattered vague, redundant and often irrelevant allegations" and is not subject to dismissal on that ground. *In re Honeywell*, 182 F. Supp. 2d at 426.  Plaintiff has satisfied the first part of the PSLRA's pleading requirement by alleging "the who, what, when, where and how" of the challenged statements.  *Avaya*, 564 F.3d at 253.

Second, in the Court's view, Defendants' argument that they disclosed facts about (1) the continuing role of human labor in Innodata's business and (2) Innodata's smaller research and development budget relative to large AI firms functions more as an answer denying the allegations of the SAC than an independent basis to dismiss the motion.  The Court agrees with Plaintiff that Defendants' argument misses the mark insofar as it does not engage with Plaintiff's core claim that Defendants falsely touted their AI capabilities.  Defendants cite *In re Amarin Corp. PLC Sec. Litig.* to support their contention that "Defendants disclosed the exact information Plaintiff[] argue[s] should have been disclosed," but in the Court's reading, the information that Plaintiff argues should have been disclosed is that Innodata allegedly had no artificial intelligence technology in their products and operations, not that they would continue to rely on human experts or that they were not attempting to compete with Palantir.  2021 WL 1171669, at *14 (D.N.J. Mar. 29, 2021), *aff'd*, No. 21-2071, 2022 WL 2128560 (3d Cir. June 14, 2022).

Third, Defendants correctly note that statements from confidential witnesses can only support claims of securities fraud where:

> "(1) the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support of a fraud allegation, or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged."

*Synchronoss II* at *6. Defendants also correctly note that, to satisfy the requirement of the second prong described above, the SAC must disclose "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Id*. The Court agrees with Defendants that Plaintiff cannot rely on the confidential former employees to support their claims of falsity for statements made by Defendants during periods in which none of the former employees was present at the company. *See Avaya*, 564 F.3d at 263 (courts should consider "the duration of each [former employee's] employment"). The Court cannot plausibly infer that the former employees had credible or firsthand knowledge about company statements made before or after their tenure. Despite Plaintiff's contention that "[e]ven low level employees…with partial class period tenure can serve as confidential witnesses," (Opp. to Innodata at 19), the cases he cites to support this claim all include other confidential witnesses who were employed throughout the class period. *See, e.g., Lord Abbett*, 363 F. Supp. 3d at 493 (citing *Avaya,* in which at least one former was employed throughout the entire class period). Plaintiff has therefore not provided the Court with sufficient particularity to sustain the claims relating to statements made when none of the former employees worked at Innodata, and those claims (identified in footnote 12 of Innodata's Motion to Dismiss) are hereby struck from the complaint.

For claims about the falsity of statements made when any of the former employees *was* employed at Innodata, the Court finds that Plaintiff has not provided sufficient particularity to

25

support an inference that the former employees possessed knowledge to support the SAC's claims. While it is true that Plaintiff need not provide the specific dates that each former employee learned the information alleged in the SAC, the allegations about how they received the information are insufficiently detailed to satisfy the standard articulated in *Synchronoss II*. *See Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 658–659 (D.N.J. 2021) ("the inquiry is a more holistic, multifactor assessment."); *Wu v. GSX Techedu Inc.,* 738 F. Supp. 3d 527, 545 (D.N.J. 2024) (accepting "plainly detailed" former employee allegations where plaintiff did not provide exact dates when the relevant information was acquired). For example, Plaintiff alleges that "[a]fter FE 1 was hired FE 1 realized that Innodata's claims about AI were 'b.s.' and after speaking to the Company's Chief Product and Marketing Officer in 2019 and 2020, he realized that Innodata was taking 'information from clients, sending the datasets overseas and letting employees get information after sifting through it.'" (SAC ¶ 62.) Plaintiff goes on to describe how "[d]uring the time FE 1 was working at Innodata, the only clarity FE 1 achieved about the 'product' they were selling was that it was 'an AI training solution and service hours'— not software or any kind of AI-based solution." (*Id.* ¶ 65.) These allegations are vague, consist of opinions more than facts, and even contradict the assertion that Innodata lacked AI completely. Similarly, Plaintiff alleges that "FE 2 worked within the DDS segment and heard that Innodata's products were 'machine learning-enabled and had AI-enabled technology to help with workflow solutions,' but FE 2 'didn't know how deep the machine learning or AI was.'" (*Id.* ¶ 67.) This statement does not corroborate Plaintiff's allegations that Innodata had no AI. Plaintiff also alleged that FE 3 stated that "[i]f you had enough people loading information onto the platform, it worked. But it was scammy, and it was junk emails you didn't really want." (*Id.* ¶ 74.) Perceived "scamminess" aside, this too is an admission that, at some level, Defendants did have at least one functional AI product.

26

Plaintiff attempts to circumvent the substantive thinness of the former employees' knowledge of Innodata's AI capabilities by invoking *In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at *7–8 (S.D.N.Y. Jan. 27, 2025) for the proposition that "it can be inferred that" FEs responsible for recruiting customers "have knowledge about whether, during the relevant times, GigaCloud 'use[d] complex AI software.'" (Opp. to Innodata at 19.)  Setting aside that in the instant case, the former employees indicated that Innodata did use AI to some extent, *GigaCloud* is distinguishable because, in that case, plaintiff also relied on statements from former employees who worked in IT, software development, and supply chain management roles in addition to the sales and customer recruitment roles analogous to those Plaintiff here relies on.  *In re GigaCloud,* 2025 WL 307378 at *7.  Similarly, in *Lord Abbett*, 363 F. Supp. 3d at 493, "the Complaint does not rest solely on allegations from purportedly 'low-level' employees who worked at Navient for less than the full class period[,]" and "at least one CW was employed at any point during the Class Period."  As pled, the former employees' statements in this case are not sufficient to support Plaintiff's claims, and there is some credence to Defendants' argument that Plaintiff's Opposition "pleads the SAC out of Court" by limiting his claims to asserting that Innodata had no AI at all. (Innodata Reply at 2.)

Fourth, the Court agrees with Defendants that the statements in the Wolfpack Report attributed to unidentified former employees regarding Innodata's AI capabilities are unreliable. Setting aside the issue of whether to apply a "hard look" to short seller reports articulated in *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 550 (D.N.J. 2024), these statements do not meet the heightened pleading standard of the PSLRA because they are not particularized.  The former employees quoted in the report are not identified, their roles are not specified, the time periods of their tenure at Innodata are not specified, and the bases of their knowledge are thus not established

in conformity with the "who, what, when, where, and how" requirements of the PSLRA.  *Avaya*, 564 F.3d at 253.  The remaining allegations in the Wolfpack Report, consisting of Wolfpack's independent research, are sufficiently particularized to support Plaintiff's claims in the SAC, to the extent that the research does in fact support those claims.

### ii.  Scienter

Defendants argue that Plaintiff fails to establish a strong inference of scienter.  First, Defendants argue that the stock sales on which Plaintiff predicates his scienter argument do not support a finding of scienter because Defendants—and Abuhoff in particular—retained most of their stock (in Abuhoff's case, 95% percent of his stock) during the Class Period.  (Innodata Mot. at 35-36.)  They cite a string of cases in which courts did not infer scienter because Defendants retained similar percentages of their stock holdings: *Dang v. Amarin Corp. plc*, 2024 WL 4285900, at *28 (D.N.J. Sept. 25, 2024); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999); *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 615–16 (1st Cir. 2017); *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *7 (N.D. Cal. Mar. 11, 2011); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986–87 (9th Cir. 1999).  Defendants also argue that Plaintiff "makes no allegation that [Defendant Espineli's] sales were unusual in comparison to her trading history or otherwise[,]" but they only allege "that she signed a handful of allegedly false or misleading SEC filings[,]" which, according to *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) "does not add to the scienter puzzle in the absence of any allegation that the defendant knew [s]he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing."  (Innodata Mot. at 36 n. 24.)

Defendants then argue that "[t]he timing of the alleged stock sales also undermines an inference of scienter[,]" because "[t]he mere fact that an insider sells stock following positive news is not itself probative of scienter," citing *Dang*, 2024 WL 4285900, at \*28 and *In re Party City*, 147 F. Supp. 2d at 312.  (*Id*. at 37.)  They argue that Plaintiff fails to allege either that the positive press releases preceding the stock sales that allegedly prove scienter were false or misleading, or the reasons why the press releases may have been misleading.  (*Id*.)  Defendants also argue that that Plaintiff's attempts to prove scienter by referring to stock sales by individuals who are not defendants in this case fail because "courts in the Third Circuit routinely hold that stock sales by non-defendants must be disregarded for purposes of pleading scienter[,]" citing *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 550 and *Building Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 WL 3749459, at \*11 (E.D. Pa. Sept. 27, 2010).  (*Id*. at 38.)

Defendants' final argument is that Plaintiff's allegation that Defendants' delayed disclosure of the parallel SEC and DOJ investigations to their investors supports an inference of scienter must fail because "plaintiffs failed to allege that the defendants had a duty to disclose the investigations" and the purported delay "'does not support a strong inference that Defendants were trying to downplay the Wolfpack Report by making investors think the allegations from the report were untrue[,]'" citing *In re iQIYI, Inc. Sec. Litig.*, 2024 WL 4362509, \*19 (E.D.N.Y. Sept. 30, 2024).  (*Id*. at 39.)  They also cite *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 465 (E.D. Pa. 2021) for the proposition that "[t]here is no Supreme Court or Third Circuit precedent holding that the mere receipt of a [U.S. Department of Justice] grand jury subpoena is a reportable event for publicly traded corporations."

In the Opposition, Plaintiff first argues that "it is implausible to suggest that Defendant Abuhoff would have been unaware of the true capabilities of Innodata Labs and that Innodata's

29

business stemmed from its human workforce in the DDS segment" because Defendant Abuhoff "served as the Company's CEO for over 20 years" and "FE 2 confirmed that Defendant Abuhoff worked with the head of Innodata Labs and would also often attend weekly team meetings with the DDS sales team." (Opp. to Innodata at 28-29.) Plaintiff cites *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189 (E.D. Pa. 2021) for an example of a court inferring scienter where an executive expressed detailed knowledge about the project at issue. (*Id.* at 29.) Plaintiff also asserts that "[g]iven her role, [Defendant Espineli] would also have necessarily been aware of […] the nature of Innodata's business and operations" and that "[i]t would have taken far less than a 'reasonable investigation' for either Defendant Abuhoff or Espineli to discover that Innodata had not developed AI[,]" citing *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 666 (S.D.N.Y. 2017). (*Id.* at 29.) In Plaintiff's view, Defendant Espineli should be considered reckless because, as in *In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *16 (S.D.N.Y. Feb. 23, 2024), she "failed to check information they had a duty to monitor." (*Id.* at 31.) Along these lines, Plaintiff then argues that "[r]emoving their stock sales from discussion would not change the fact that Defendants were at least reckless." (*Id.*) He also argues that Defendants' alleged delay in disclosing the SEC and DOJ investigations implies a "motive to falsely dampen 'troubling news[,]'" which in turn "plausibly supports an inference of scienter[,]" citing *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020). (*Id.* at 32.) Plaintiff also asserts that Defendants waive the issue of Innodata's corporate scienter by not making any arguments on that issue. (*Id.*)

Plaintiff then argues that "[t]he decline of Innodata's DDS segment and Innodata's history of redefining its business model also suggest that Defendants were motivated to preserve Innodata's profitability." (*Id.* at 33.) Plaintiff offers that "the amount of stock retained by

Defendant Abuhoff does not discount the nature of his sales[,]" and that "[v]iewed holistically, Plaintiff's allegations of Defendants' knowledge, motive, and opportunity, give rise to a strong inference of scienter." (*Id.* at 34-35.)

In their Reply, the Innodata Defendants dispute Plaintiff's argument that the stock sales following optimistic statements were suspicious by arguing that Plaintiff "ignores that 3 of the 4 'optimistic statements' are not alleged to be misleading (and the fourth has no allegations as to why it is misleading), evading discussion of cases like *In re Party City Secs. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001)[.]" (Innodata Reply at 13.) Defendants also note that "[t]he Opposition does not even mention the legion of cases (including from the 3rd Circuit) holding that retaining stock in percentages like Abuhoff *negates* an inference of scienter." (*Id.*) Defendants reiterate their argument that the allegedly delayed disclosure of the investigations does not support an inference of scienter, providing examples that Plaintiff's case citations on this point are either inapposite or contrary to the law. (*Id.* at 14.) Finally, Defendants make several points refuting the idea that the circumstantial evidence Plaintiff points to supports an inference that the Innodata Defendants knowingly made false statements to defraud investors. (*Id.* at 15.)

First, the Court is persuaded that Plaintiff has failed to plead a strong inference of scienter based on Defendants' motive and opportunity. The stock sales Plaintiff references do not support a strong inference of scienter because Plaintiff has not shown that the stock sales were unusual or that they amounted to a divestment of the Innodata Defendants' interests in the company sufficient to arouse suspicion. *In re Party City*, 147 F. Supp. 2d at 312 ("Stock sales may support an inference of scienter only if such sales were unusual in scope or timing") (internal citations omitted). Plaintiff's allegation that Defendants' profits from the stock sales "were significant and far surpassed each of their yearly salaries" is undermined by the fact that Defendants appear to have

31

retained the majority of their investments in the company. (Opp. to Innodata at 34.) Plaintiff's allegation that the stock sales were suspicious because they came on the heels of positive statements is also unconvincing, as "[t]rading following public announcements simply evidences compliance with the securities laws." *Id.* (citing *In re Party City*, 147 F. Supp. 2d at 312). Moreover, the cases Plaintiff cites on this point are both distinguishable and non-binding. For example, while Plaintiff offers that *In re Secure Computing Corp. Sec. Litig.* is an example of a court finding stock sales to be suspicious because of their timing, a review of the case reveals that the court drew this conclusion due to the timing "combined with the unrebutted assertion that they were the first sales of any stock by any of the individual Defendants[.]" 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001). No such similar allegation exists here. Absent more specific allegations, the Court cannot conclude that the scope and timing of Defendants' collective stock sales during the Class Period is sufficient to support a strong inference of scienter.

Plaintiff aptly notes that Defendants' positions as executives within Innodata would position them to have knowledge about the status of Innodata's AI programs and products. Plaintiff's argument on this front is undercut by his allegations indicate that Innodata did have some level of functional AI. In other words, if Plaintiff's sources are to be believed, as Plaintiff urges this Court to do, then it is true that Innodata had some kind of AI. If Innodata had some kind of AI, they cannot have acted with scienter in making the statements challenged in the SAC, because the statements would have been true. In this regard, Plaintiff's argument is self-defeating. Plaintiff's other argument, that the allegedly "delayed" disclosure of the SEC and DOJ investigations supports an inference of scienter, is defeated by Plaintiff's failure to plead that Defendants had a duty to disclose these investigations. *In re iQIYI, Inc. Sec. Litig.*, 2024 WL 4362509, at *19 (E.D.N.Y. Sept. 30, 2024) ("any purported delay in disclosing investigations does

not support a strong inference that Defendants were trying to downplay the Wolfpack Report […] a more compelling inference is that Defendants did not believe it was necessary to immediately address the report") (internal citations omitted).

### iii. Loss Causation

Regarding loss causation, Defendants argue that "[a]s a matter of law, the Wolfpack Report cannot serve as a corrective disclosure[.]" (Innodata Mot. at 30.) They argue that the Wolfpack Report's authors' inclusion of disclaimers against the accuracy or completeness of the information in the Report indicates that "the Wolfpack Report cannot meet 'the high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers' to satisfy loss causation[,]" citing *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022). (*Id.* at 31.) Defendants also assert that the Wolfpack Report cannot be a corrective disclosure as a matter of law because "corrective disclosures reveal previously concealed facts, not mere opinions regarding previously disclosed facts." (*Id.*) They cite a string of cases from various courts around the country declining to find reports issued by short sellers to be corrective disclosures because the reports did not provide any new, non-public information about the companies discussed: *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Petersen v. TriplePoint Venture Growth BDC Corp.*, 2024 WL 5384678, at *11 (N.D. Cal. Aug. 7, 2024); *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443 (S.D.N.Y. 2022). (*Id.* at 31-32.)

In the Opposition, Plaintiff argues that "[t]he Complaint readily pleads loss causation." (Opp. to Innodata at 36.) He asserts that "Defendants wrongly attempt to apply the Ninth Circuit's application of 'the more stringent requirements of Rule 9(b),' but that is not the law in the Third Circuit[,]" citing two cases in which courts in this Circuit indicated that the loss causation element of a 10(b) claim is not subject to the heightened pleading standards of Rule 9(b) and the PSLRA:

*Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000); *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020). (*Id.* at 36-37.)    Plaintiff also argues that the drop in stock price following the issuance of the Wolfpack Report supports the idea that the Report was a corrective disclosure. (*Id.* at 37.)

In the Reply, Defendants argue that Plaintiff fails to identify any new information contained in the Wolfpack Report, and that "the Opposition never explains how a report that expressly disclaims its own accuracy, admits bias, and *discloses no new information* can 'plausibly' […] support the allegation that 'the misstatement or omission *concealed* something from the market that, *when disclosed*, negatively affected the value of the security[,]'" citing *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 432 (3d Cir. 2007). (Innodata Reply at 10-11.) They also argue that the Court should reject the idea that the drop in stock price alone is sufficient to establish loss causation. (*Id.* at 12.)

Plaintiff is correct that in the Third Circuit "[t]he loss causation element of a § 10(b) claim is not subject to the heightened pleading requirements of Fed. R. Civ. P. 9 (b) and the PSLRA." *Vanderhoef*, 2020 WL 5105243 at *4.  Defendants' argument that the Wolfpack Report cannot serve as a corrective disclosure because it provides the public with no "new information" (Innodata Reply at 10-11) is thus of no moment, as "[l]oss causation is properly alleged if it meets Rule 8(a)'s standard by giving a short and plain statement of economic loss and its causal connection to the alleged misrepresentations and/or omissions." *Vanderhoef*, 2020 WL 5105243 at *4 (internal quotations omitted).  Plaintiff runs into the same issue plaguing his motion insofar as his own allegations indicating that Innodata did have some form of AI cut against a finding of a misrepresentation that could have caused investors' losses.  Thus, while the Wolfpack Report can properly serve as a corrective disclosure, Plaintiff's loss causation argument fails because he has

34

not sufficiently articulated the necessary conditions of misrepresentations or omissions on Defendants' part.

### b. Defendant Spelker's Motion

In his Motion to Dismiss, Defendant Spelker first argues that Plaintiff has not sufficiently alleged that Spelker made a material misrepresentation or omission, noting that "[o]ut of the numerous purported misstatements Plaintiff alleges, Plaintiff claims only that the 2020 Form 10-K that Messrs. Abuhoff and Spelker signed contained two alleged misstatements." (Spelker MTD at 5-6.) Spelker also argues that "Plaintiff alleges no facts showing that Goldengate was not the Company's core AI technology and that it was not used in connection with customer projects." (*Id.* at 7.) Spelker then argues that Plaintiff "pleads no facts regarding Mr. Spelker's purported scienter whatsoever[,]" pointing out that the SAC contains no allegations "that Mr. Spelker ever received information calling into question the truthfulness of the two statements for which he is being sued[,]" or "that Mr. Spelker received documents making clear that Goldengate did not exist or was not used in connection with Innodata's customer projects." (*Id.* at 7-9.) Spelker also argues that Plaintiff makes no "motive and opportunity" as to him, and that Plaintiff does not allege that he ever bought or sold Innodata stock. (*Id.* at 9-10.)

Plaintiff opposes Defendant Spelker's Motion by arguing that the SAC contains sufficient allegations that Defendant Spelker was at least reckless in signing off on allegedly false statements regarding Innodata's AI. (Opp. to Spelker at 4.) Plaintiff argues that Defendant Spelker's position as CFO would have given him the requisite knowledge to support an inference of scienter. (*Id.* at 4-6.)

In his Reply, Defendant Spelker notes that "a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts[,]" citing *In re Advanta Corp.*

*Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999), among several other cases articulating the same point. (Spelker Reply at 3-5.)

The Court agrees with Defendant Spelker that Plaintiff has not sufficiently stated that he acted with scienter in signing off on the allegedly false statements. Spelker's invocation of *In re Advanta* and similar cases is apt, as Defendant pleads no other facts supporting a strong inference of scienter besides the bare assertion that Defendant Spelker's position as part-time CFO would have apprised him of the alleged falsity of Innodata's statements about AI. This is not enough to sustain a securities fraud claim.

## IV.    CONCLUSION

For the reasons articulated above, the Second Amended Complaint is DISMISSED without prejudice. An appropriate order follows.

*/s/ Jamel K. Semper*
**Hon. Jamel K. Semper**
**United States District Judge**

Orig:   Clerk
cc:     Jessica S. Allen, U.S.M.J.
        Parties